Pablo **CABRERA**, Plaintiff,

v.

**TEATRO DEL SESENTA, INC.,
et al., Defendants.**

**Civil No. 94–2021 (JAF/ADC).**

United States District Court,
D. Puerto Rico.

March 31, 1995.

---

Harry Anduze, Víctor P. Miranda, San Juan PR, for Plaintiff Pablo Cabrera.

María L. Jiménez, San Juan PR, for Defendants Idalia Pérez Garay, Eneida Molina, Ulises Santiago, José Félix Gómez and Pedro Juan Texidor.

## OPINION AND ORDER

DELGADO–COLON, United States Magistrate Judge.

### I. FACTUAL BACKGROUND

On July 26, 1994, plaintiff Pablo Cabrera (Cabrera) filed a Complaint and Request for Injunctive Relief alleging copyright infringement under the Copyrights Act, 17 U.S.C. § 101, et seq., false designation under the Lanham Act, 15 U.S.C. § 1125(a), and for damages under Article 1802 of the P.R.Civil Code, 31 L.P.R.A. § 5141. It is alleged that the defendants Teatro del Sesenta, Inc. (Teatro), Idalia Pérez–Garay (Pérez–Garay), Eneida Molina (Molina), Ulises Santiago (Santiago), José F. Gómez (Gómez) and Pedro Juan Texidor (Texidor), who are either members, associates or collaborators of Teatro claiming coauthorship of the play, intended to produce and present the theater play "La Verdadera Historia de Pedro Navaja" ("Pedro Navaja") in violation of plaintiff Cabrera's authorship rights.

▮▮▮▮ Cabrera claims to be the sole author of the music and lyrics for the play, which was originally staged on September 19, 1980, under his sole direction. It is also claimed that the scenic and theatrical conceptualization are Cabrera's intellectual property. The Certificate of Copyright Registration No. PAU–276–120 issued by the U.S. Copyrights Office on March 12, 1981, was obtained through the financial and administrative efforts of Teatro and appears issued under the sole name of Pablo Cabrera. Based on the prima facie presumption with which the certificate of registration vested the plaintiff (17 U.S.C. § 410)[1], it was requested that defendants be enjoined from producing, staging and presenting the play "Pedro Navaja."

---

1. Section 410(c) of the Copyrights Act of 1976, as amended, specifically provides that:

   In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court.

   The copyright certificate is prima facie evidence that the copyright holder retains all rights granted by copyright. American International Pictures, Inc. v. Foreman, 576 F.2d 661 (5th Cir. 1978); Pedrosillo Music, Inc. v. Radio Musical, Inc., 815 F.Supp. 511 (D.P.R.1993) (registration of musical composition constituted prima facie evidence of elements of originality and authorship); CMAX/Cleveland, Inc. v. UCR, Inc., 804 F.Supp. 337 (M.D.Ga.1992) (certificate constitutes prima facie evidence of validity of copyright and of facts stated therein); Chi–Boy Music v. Towne Tavern, Inc., 779 F.Supp. 527 (N.D.Ala. 1991); Van Cleef & Arpels, Inc. v. Schechter, 308 F.Supp. 674 (D.C.N.Y.1969); Remick Music Corp. v. Interstate Hotel Co., 58 F.Supp. 523 (D.C.Neb.1944), aff'd. 157 F.2d 744, cert. denied, 329 U.S. 809, 67 S.Ct. 622, 91 L.Ed. 691, reh. denied, 330 U.S. 854, 67 S.Ct. 769, 91 L.Ed. 1296 (1947).

   In the instant case, the first certificate of registration was issued on March 12, 1981, well within the first five years of the first publication or staging of the work, and Pablo Cabrera not only appears as the rightful owner and author of the theater play but is vested with such statutory presumptions (see Attachment to Exhibit 20). Due to the existence of a statutory rebuttable presumption, the defendants had the burden of presenting evidence to the contrary. Gaste v. Kaiserman, 863 F.2d 1061 (2d Cir.1988); Tempo Music, Inc. v. Famous Music Corp., 838 F.Supp. 162 (S.D.N.Y.1993) (the certificate creates only a rebuttable presumption of copyright validity, and validity will not be assumed where other evidence in record casts doubt); Sandwiches, Inc. v. Wendy's Intern, Inc., 654 F.Supp. 1066 (E.D.Wis. 1987), appeal dismissed, 822 F.2d 707 (7th Cir. 1987). Certificate of copyright registration is prima facie evidence of facts stated therein, but presumption may be dispelled. Grove Press, Inc. v. Collectors Publication, Inc., 264 F.Supp. 603 (D.C.Cal.1967). See also Monogram Models, Inc. v. Industro Motive Corp., 448 F.2d 284 (C.A.Mich. 1971); McIntyre v. Double–A Music Corp., 166 F.Supp. 681 (D.C.Cal.1958), motion for new trial denied, 179 F.Supp. 160 (S.D.Cal1959). In the instant case, the defendants agreed, they had the burden of overcoming the presumption (Tr. July 29, 1994, p. 8).

On July 27, 1994, at plaintiff's request, the District Court issued a Temporary Restraining Order, enjoining the presentation of the theater play which was to be presented on August 3, 1994.[2] (Docket # 3).

The next day, that is, on July 28, 1994, the defendants filed their answer to the complaint and requested the dissolution of the restraining order, alleging: that the efforts for the presentation of the play had begun on May, 1994, and that they had incurred in substantial costs and expenses;[3] that the order was based on plaintiff's allegation of exclusive authorship when in fact the theater play was the product of the collaboration of the plaintiff and the defendants and was therefore a "joint work," as defined in 17 U.S.C. § 101 of the Copyrights Act; the defendants also possessed a supplementary Certificate of Registration (PAU–1–806–555) issued by the U.S. Copyrights Office under the disposition of § 408(d) of the Copyrights Act [17 U.S.C. § 408(d)];[4] no consent to stage or license the use of the play was needed from a co-author; Teatro had staged and produced the play on over 400 different occasions with plaintiff's knowledge; and since 1989 plaintiff, with whom defendants had dealt in good faith, was aware and formally notified of defendants' co-authorship claim.

On July 28, 1994, at a fruitless settlement conference before the district judge, parties consented to have trial conducted before this Magistrate–Judge pursuant to 28 U.S.C. § 636(c). Pursuant to Fed.R.Civ.P. 65(a)(2), the district court consolidated the hearing for the preliminary injunction with the trial on the issue of authorship. The issue of damages should there be any, was to be decided later by a jury.

Trial commenced on July 29, 1994. During the second day of trial, the plaintiff voluntarily moved the Court to lift and vacate the temporary restraining order, agreeing to allow the defendants to present performances of the play.[5]

## A. THE LEGAL ISSUE AND OUR CHARACTERS

The plaintiff claims to be the sole author of the play "Pedro Navaja." The defendants, to the contrary, claim to have conceived of the idea and conceptualization for the play, inspired by a song of Rubén Blades (Blades), a Latin American composer. The defendants further claim that the script for the play is the product of the joint or collective work of all the parties, and that all defendants, as well as the plaintiff are to be considered co-authors of the play.

At the time the play was written, all defendants were members of Teatro, a non-profit theater company, with two main goals: promoting the dramatic arts in Puerto Rico and raising the necessary funds to buy the Sylvia Rexach Theater (Rexach Theater).

All defendants, the plaintiff and some of Teatro's collaborators testified during trial. Although the parties' specific intent, contributions, and collaboration are described in detail in the factual exposition of this case, it is necessary for a global understanding of the facts presented, that their professional background be known.

### 1. Idalia Pérez–Garay (Pérez–Garay)[6]

This defendant became a member of Teatro in 1967 and its Artistic Director in 1989. She is considered one of the founding mem-

---

**2.** The order was to be valid until August 6, 1994. As ordered, on July 27, 1994, plaintiff posted a $5,000.00 bond (Docket # 5).

**3.** An affidavit in support reflects expenses for an amount over $100,000.00. The estimated operation budget exceeds $200,000.00. (Docket # 7).

**4.** The effective date of the supplementary registration is February 2, 1993. This supplementary registration listed Cabrera, Molina, Pérez–Garay, Santiago, Gómez and Texidor as co-authors of the "Book and Lyrics" for the play. (Exhibit P).

**5.** The parties had agreed to ten initial presentations of the play. On August 19, 1994, the parties entered into a subsequent agreement where plaintiff consented to two additional staging and the defendants agreed to discontinue its presentation until final resolution of the issues in this case. The Court, in granting plaintiff's request also ordered all economic proceeds from the play to be deposited in Court, and that the defendants submit financial statements providing a full accounting of all income and expenses incurred.

**6.** Tr. July 29 and 30, 1994, p. 20–151.

bers of Teatro and has been a professor of the Drama Department of the University of Puerto Rico since 1969. She has a Masters Degree in Theater from Center College in Strausberg, France. Pérez–Garay has excelled as an actress and has devoted her life to the theater media.

During the play's presentation, Pérez–Garay participated as an actress in the starring female role and also as costume designer and assistant director during the auditioning sessions.

### 2. Eneida Molina–Casanova (Molina) [7]

A defendant and scriptwriter who graduated from the National College of Journalism in Madrid, Spain, Molina has vast experience in journalism and advertisement. She has written scripts for several historical/cultural productions and documentaries for the state government through Producciones Culturales, Inc., a family corporation to which she is a partner. Molina received first prize at the New York Film Festival for her work "Step Away", a film written for the Pan American Games. These cultural productions along with one written and produced for the Puerto Rico Olympic Committee ("Sports as a Cultural Expression"), the script for the film "We Were Always Here", and "The History of Women in Puerto Rican History", were scripts and documentaries written prior to the work on the play "Pedro Navaja."

Molina was a collaborator but not a member of Teatro. She was commissioned by Teatro's Artistic Committee to write an adaption of Brecht's "The Three Penny Opera." She wrote and submitted the first act for the script and its subsequent revision. The play was then entitled "La salsopera de dos chavos" (Exhibit R and S).

### 3. Pedro Rivera–Toledo (Rivera–Toledo) [8]

This witness for the defendants is one of the most prestigious Puerto Rican music composers. He wrote the music for all of the

songs in "Pedro Navaja" after being recruited by Pérez–Garay to collaborate on the project. In this particular case Rivera–Toledo received the lyrics of the songs from Pérez–Garay, and then wrote its music. Later on, he assisted the defendants (mainly Pérez–Garay, Gómez, Texidor) and plaintiff Cabrera in the auditioning and selection of the singing actors for the play.

### 4. José Félix Gómez (Gómez) [9]

This defendant is an Associate Professor of Drama Theater at the University of Puerto Rico, School of Humanities. He received a Masters in Fine Arts (Theatrical Arts and Directing) from Ohio University and has taught courses in Acting, Diction, Drama Appreciation, Theater History, Avant–Garde Theater, and Stage Design. In the professional arena he has directed his own plays and monologues and has had an extensive professional career. Gómez has been a member of Teatro since 1972, and although its Associate Artistic Director, he has also performed as director, actor, writer, executive producer, and designer.

During the presentation of "Pedro Navaja" he participated as an actor in the leading role of Pedro Navaja, and as the Executive Producer of the music.

### 5. Belén Ríos (Ríos) [10]

This witness for the defendants joined Teatro in 1966, and since then has performed as an actress, administrative assistant, secretary, and Head of Publicity and Public Relations.

While performing and working for Teatro she witnessed the working sessions and creative process that preceded the creation of the script and the play's presentation. Ríos was also responsible for the administrative and clerical activities conducted to obtain the copyright certifications in this case.

7. Tr. July 30, 1994, p. 152–214.

8. Tr. July 30, 1994, p. 53–76.

9. Tr. July 30, 1994, p. 3–53.

10. Tr. August 2, 1994, p. 6–69.

### 6. *Jaime S. Ramírez–Colón (Ramírez)* [11]

Having graduated from the New York University in Stonybrook, with a Masters Degree in Education and History, Ramírez joined Teatro in 1980 and five years later became the President of its Board of Directors. During the initial staging of the play in 1980, he was designated "stage manager" and during its second staging in 1984, he served as an assistant director.

Throughout his testimony, Ramírez described his duties during the initial and subsequent staging of the play, the process through which the copyright registration was obtained, Teatro's rights over the play, the creative process in which plaintiff and members of Teatro did participate and defendants' claims since 1989 regarding the issue of authorship rights.

### 7. *Pedro J. Texidor (Texidor)* [12]

Texidor, a codefendant, is an actor, director, producer, set and lighting designer and member of Teatro from 1971 to 1985. Throughout these years, he performed as a Board member, house set designer, actor and producer for Teatro.

Texidor while asserting co-authorship, claimed to have participated in the writing and creative process which began in mid or late 1979, and in the conceptualization of the structural scenic design over which he claims ownership.

### 8. *Ulises Santiago (Santiago)* [13]

This defendant was a member of Teatro from 1972 to 1982. During these years he performed as Teatro's Artistic Director and was responsible for examining, reading and selecting the scripts of plays submitted to the company for production. With approximately twenty-five years of experience in the theater media, Santiago has worked in private advertising companies as well as for Teatro. Throughout his testimony, he alleged having participated with Pérez–Garay and Molina in the conceptualization of the idea and character for the play and in the "joint" creative process.

### 9. *Carmela Rivera–Santiago (Rivera–Santiago)* [14]

Now the Vice–President of the Puerto Rico Actors Association, she testified having joined the team for the play in May, 1981, at a time when Cabrera had already entered the theater. She graduated from the Drama Department at the University of Puerto Rico and had some post-graduate credits in Theatrical Literature. As an actress, she had participated in "Pedro Navaja" in the role of La Colectora. Rivera–Santiago joined Teatro in 1972 and thereafter was a member of Teatro for approximately ten years. While a member, she participated in the Regulations Committee and was invited to collaborate with the Artistic Committee as well.

She testified regarding the play's conceptualization, when the work was initially given to Molina, and how the task of writing the script was subsequently assigned to Cabrera.

### 10. *Jazmine Mejías–Lugo (Mejías)* [15]

During her brief testimony on behalf of the plaintiff, Mejías testified to having played minor roles in the play. She commenced her participation on the play in the summer of 1980 when she began attending the rehearsals that lasted for two months, and had no personal knowledge concerning the issue at bar.

### 11. *Zulma Cruz–Solá (Cruz)* [16]

This witness for the plaintiff is an employee for the Institute of Puerto Rican Culture and an associate professor in television, production and directing at the University of Sacred Heart in Santurce, Puerto Rico.

In 1979 she accompanied Cabrera to a meeting to be held with members of Teatro at the Rexach Theater. At the meeting Tea-

11. Tr. August 2 and 3, 1994, p. 69–108.

12. Tr. August 3, 1994, p. 108–155.

13. Tr. August 3, 1994, p. 4–75.

14. Tr. August 4, 1994, p. 3–21.

15. Tr. August 4, 1994, p. 21–27.

16. Tr. August 4, 1994, p. 27–36.

tro presented its idea for a new musical play based on Blades' song "Pedro Navaja" and recruited Cabrera to direct it. During 1980 she assisted Cabrera, while working on the script for the play, as a consultant.

In 1989, while being the Director of the Theater Department at the Institute of Puerto Rican Culture she contacted Cabrera, as the person with the "copyright" as well as a private producer to arrange for the presentation of the play "Pedro Navaja" in a theater festival to be held in Buenos Aires, Argentina.

### 12. *Angel R. Cruzado–Miranda (Cruzado)* [17]

As the Administrator of the Rexach Theater, he had his office located in the first floor, lobby area of the theater. He testified concerning the working sessions in which the parties engaged from May to October, 1980.

### 13. *Elías López–Sobá (López–Sobá)* [18]

López–Sobá, a witness for the plaintiff, was the Executive Director of the Puerto Rican Institute of Culture between March, 1985 and March 1989. He testified that during the second half of 1985, he explored the possibility of presenting "Pedro Navaja" in Venezuela. The sole purpose of the negotiations between the National Theater of Venezuela and Teatro were in order to obtain the recording of the musical track for the play which had been paid by Teatro.

### 14. *Manuel González–Gierbolini (González–Gierbolini)* [19]

González–Gierbolini is a practicing attorney, a witness for the plaintiff, and since 1965, a personal friend of Cabrera. Having previously participated as a singer in different operas in Puerto Rico, some, under Cabrera's directorship, he also participated in

the first presentation of the play "Pedro Navaja" in 1980.

### 15. *Carmen Lillian Marín–Pérez–Marchand (Marín)* [20]

As a lecturer at the Eugenio María de Hostos Community College of the City University of New York since 1974, Marín got to know Cabrera, who at the time was the chairperson of the then Puerto Rican Studies Department at the same college. Marín testified that in the week of July 20, 1980, she had shared with Cabrera a business trip to the Dominican Republic during which Cabrera was writing the dialogue for a Mexican character on the play. It was her opinion that at the time, Cabrera was working on the first act of the script.[21]

### 16. *Johanna Rosaly (Rosaly)* [22]

At Teatro's request in September 1980, Rosaly began acting as the spokesperson for Teatro's fundraising campaign for the purchase of the Rexach Theater. Subsequently, in February 1981, she got involved in the presentation of "Pedro Navaja" as an actress in the starring female role originally performed by Pérez–Garay, one of the major figures of Teatro who had temporarily withdrawn due to pregnancy. The witness had no personal knowledge concerning the issue of authorship.

### 17. *Pablo Cabrera (Cabrera)* [23]

The plaintiff is a full professor at and, since 1981, the Director of the Humanities Department at the Eugenio María de Hostos Campus of the University of the City of New York. He received a Bachelor in Sciences from the University of Puerto Rico and continued studies in acting and theatrical directing at the Sylvio D'Amico Academy in Rome, Italy. At the Center for Experimental Film in Rome he received the equivalent of a

**17.** Tr. August 4, 1994, p. 37–43.

**18.** Tr. August 4, 1994, p. 44–47.

**19.** Tr. August 4, 1994. p. 48–75.

**20.** Tr. August 4, 1994, p. 76–81.

**21.** No particular reason was proffered to substantiate such belief. However, by examining

Exhibit A, it can be determined that the only Mexican character that appears in the play is that of "Jalisco" who appears in both acts.

**22.** Tr. August 8, 1994, p. 3–10.

**23.** Tr. August 8, 1994, p. 11–107.

certificate in film directing. He obtained his Masters Degree, majoring in American Studies, from New York State University, Buffalo Campus. His areas of studies included subjects in the theatrical production of the Puerto Ricans in New York. Thereafter, he attended seminars in educational television at the College Park Campus of the University of Maryland, specializing in the creation of scripts and production.

As a professor he has participated in the exchange programs between the City University of New York (CUNY) and the University of Puerto Rico. He has taught acting courses in the program of the Puerto Rican Traveling Theater.

For the television media he has worked for several public and private television stations. He has also acted as the television director for the Casals Festival.

The plaintiff claimed co-authorship and/or authorship of three plays: "Eleuterio, el Coquí," [24] "Pedro Navaja," and "Death on the Nile." In addition, he testified to having created translations and adaptations of other plays and to having directed operettas ("zarzuelas"), musical comedies, and numerous other theater plays in Puerto Rico and the United States. He has also acted as costume designer for several plays, and with the play "Pedro Navaja" he participated twice in the New York Shakespearean Festival.

At trial, Cabrera substantiated his claim of sole authorship by explaining the sequence of events that transpired from the time he was recruited to collaborate as a director until he was requested to and did write the final script for the play. He reported how he developed the scenic conceptualization, some of the characters, the play's structure as a soap opera, and the enrichment of historical references. He also testified about the differences and similarities between his characters and those in the works from which the play was derived. He disclaimed the existence of a collective creative process and stated that no issue ever arose concerning

authorship rights until 1989 when as alleged, the defendants began confusing authorship rights with their right to produce and stage the play.

## II.  THE TRUE STORY OF PEDRO NAVAJA

### A.  PROLOGUE

In 1928, John Gay wrote the theater play "The Beggar's Opera." Afterward, inspired by this play, Bertolt Brecht authored "The Three Penny Opera," a musical adaptation of Gay's work. Sometime during 1979–1980, Blades, a Latin–American composer and singer, wrote the song "Pedro Navaja," containing an adapted description of "Mack the Knife," the starring character in Brecht's play.

### B.  THE IDEA

During one of Blades' public concerts in Puerto Rico, Pérez–Garay's sister listened to the "Pedro Navaja" song and considered it an excellent theme for a musical play. She shared the idea with her sister, and the two continued to discuss the idea of presenting a production using Blades' song and an adaptation of Brecht's play (Tr. July 29, 1994, p. 26–27, 121).

Pérez–Garay, who since 1967 had been a member of Teatro, as well as a member of its Artistic Committee,[25] shared the idea for the new theater play at a Committee meeting held in mid–1979. Although Cabrera was not a member of Teatro nor of the Artistic Committee, he was a well-known theater director, who was invited to discuss the possibility of directing future plays for Teatro. (Tr. July 29, 1994, p. 29–31; August 4, 1994, p. 2–23). The idea of a production using Brecht's play and Blades' song was well-received by everyone, including Cabrera, and immediately approved by the Committee. At that time, Cabrera was asked to and expressed his willingness to direct future plays for Teatro and asked to be notified once a script existed.

---

**24.** This is the only play written prior to Pedro Navaja, which Cabrera had co-authored.

**25.** All members of Teatro, were at times members of the company's different committees. It

appears that the Artistic Committee, to which most of the codefendants were members, had the main responsibilities and managerial duties.

(Tr. July 29, 1994, p. 30–33; August 4, 1994, p. 28–29; August 8, 1994, p. 29–30).

The Artistic Committee continued to discuss the production and staging of a musical. They wanted to present a play that would attract the public's interest, preferably a musical portraying a popular theme. The presentation needed to be financially sustainable considering Teatro's non-profit status and the fact that the organization did not receive government or private financial funding. Among Teatro's plans was to buy the Rexach Theater, in order to continue to promote the Puerto Rican culture and arts. (Tr. July 29, 1994, p. 22; August 4, 1994, p. 28–29).

At the time of the conceptualization of "Pedro Navaja," and as part of its new policy and fund raising campaign strategy, Teatro sought the collaboration of, and actively recruited persons outside of its membership. For its continuous efforts in promoting theater, Teatro earned the respect and recognition of those in the artistic media who frequently collaborated with Teatro by donating their work, time and skilled efforts. Consequently, popular actors and actresses could be counted among its cast members.

Also during that period, scriptwriter Molina, who was known to co-defendants Pérez–Garay and Santiago, was collaborating with Teatro in the identification, evaluation and selection of plays for presentation. In mid-1979, Molina was participating in the presentation of a theater play being staged by Teatro. The Artistic Committee decided to commission Molina to write the adaptation of Brecht's play. (Tr. July 29, 1994, p. 33–35, 154–155).

## C. *THE SCRIPT*

Although it is not clear if Molina was commissioned to write the adaptation during late 1979 or early 1980, it is certain that members of Teatro held at least two meetings at Molina's house during early 1980. At one of those meetings, members of the Artistic Committee including Pérez–Garay, Santiago and Texidor, discussed with Molina the parameters of the production and their conceptualization for the play based on Blades' song. It was recommended that the adaptation should take place in Puerto Rico during the 1950's. Moreover, after discussing whether the play should be adapted from Gay's or Brecht's play, the participants agreed to fashion the adaptation from Brecht's play. (Tr. July 29, 1994, p. 34–35, 156–160, 165).

After the initial two meetings with members of the Artistic Committee, Molina began to write the script. On or about May 29, 1980, she submitted a script for the first act of the play to the Artistic Committee. On or close to that date, Pérez–Garay mailed to Cabrera a copy of that script with a handwritten letter which included the Committee's recommendations (Tr. July 29, 1994, p. 39–41, 65). Although Cabrera claims not to have received Pérez–Garay's original letter, he admitted receiving a copy of the script and providing Pérez–Garay with his comments sometime during early June, 1980. Pérez–Garay's handwritten letter also made reference to a second meeting at Molina's house for a more in-depth analysis of the script and for an initial review of the expected second act of the play. In that same letter, Cabrera was told he had "free hands" ("manos libres") to present his suggestions and comments. (Exhibit Q). Cabrera admitted having called Pérez–Garay and provided her with his comments, similar to the Committee's recommendations, which included the addition of more specific allusions to events occurring in Puerto Rico during the 1950's. (Tr. August 8, 1994, p. 31–35). Cabrera claims to have pointed out that Blades' song, had to be included.

The Artistic Committee met again with Molina, who, after reviewing its recommendations, proceeded to revise her script (Exhibit S). While Molina continued writing the script, Pérez–Garay recruited others to collaborate on the production. Rivera–Toledo was recruited to write the music for the original songs. Blades was also contacted and granted Teatro written permission to use his song "Pedro Navaja" in the play. (Exhibit 37).

Codefendants and plaintiff agree that it was sometime during the summer of 1980, after receiving copy of Molina's Act One that Cabrera traveled to Puerto Rico. Cabrera

claims that upon his arrival in June 1980, he brought his copy of Molina's script with some annotations and commentaries, and that he then participated in a series of meetings with members of the Artistic Committee (Pérez–Garay, Gómez, Santiago and Texidor), some other collaborators, and Molina, who attended the initial four meetings. (Tr. July 29, 1994, p. 56). Cabrera stated that upon his arrival he was provided with a second copy [26] of the script (Exhibit R) which was unacceptable to him inasmuch as it was essentially the same as the first draft he had received and too similar to Brecht's play. (Tr. August 8, 1994, p. 36). Regardless of what exactly happened upon Cabrera's arrival to Puerto Rico, the evidence presented clearly indicates that all of the members of the Artistic Committee, as well as the plaintiff, understood and decided that the script had to undergo structural changes, and that its contents had to be less dramatic and more representative of popular traditions and Puerto Rico's historical events, society and culture. (Tr. July 29, 1994, p. 137–138). All the parties, at some point, jointly discussed and made some changes to Molina's script. (Tr. July 29, 1994, p. 61–63, 163–173) (*See also* Exhibit S (Molina's script with Cabrera's handwriting on it)).

Even though the defendants continued to assist Cabrera, it appears that the work of writing was entrusted to him for several reasons, including defendants' other professional obligations and their interest in seeking the collaboration of prestigious directors.

As to a second act ever written by Molina, it appears that after the fourth meeting, she was discouraged by personal conflicts among the participants. Although a draft existed, she discarded it without submitting it. While she refrained from attending subsequent working sessions, she claims to have assisted Santiago in his work throughout the entire creative process. (Tr. July 29, 1994, p. 75–76).

#### D. A JUNCTURE

At this stage, the parties' versions regarding subsequent events, the creative and deci-

sion-making process, their individual participation during the development of the play, and their respective contributions to the final version of the play's script seriously differ.

While Cabrera asserts that Molina's work was totally discarded since he objected to directing a play that so closely resembled Brecht's, the defendants argue that Molina's draft was utilized as the basis of their subsequent working sessions, in addition to serving as a guide, along with Brecht's and Gay's plays, during the creative process. (Tr. July 29, 1994 p. 47–48, 123; August 4, 1994, p. 6, 37–38).

The task of determining if Molina's work was ever discarded or utilized, is more difficult than simply assessing the credibility of the witnesses. Both parties (plaintiff by himself and the defendants as a group) had the necessary expertise, knowledge and skills within the theater media to have completed and rehearsed the script over a rather short period of time, and both parties had been involved in adaptations of works of other writers.

It is important to note that in July, 1980—that is, within one month after Cabrera's arrival to the Island—the first act of the script had been completed and was being utilized during initial rehearsals. (Tr. August 4, 1994, p. 14, 24, 53–54). Moreover, the defendants and Cabrera spent a significant amount of time that summer reviewing Molina's script and discussing the play's conceptualization and contents. Additionally, Teatro members devoted time to preparing the working facilities at the Rexach Theater and to research, while Cabrera also spent time rereading Brecht's and Gay's plays and carefully examining Blades' song. (Tr. August 8, 1994, p. 40–41).

Thus, this Court concludes that the availability and utilization of Molina's submitted script facilitated the prompt and satisfactory editing and completion of the first act in such a short period of time. This is in no way incompatible with the fact that the play's

---

**26.** This copy was described by Cabrera as partially handwritten with portions typed. This coincides with Molina's testimony to the effect that she reworked the initial script based upon recommendations received from the Artistic Committee.

structure was later changed to that of a soap opera or that a new character (the Lynx) acting as a narrator, was later included to provide an overall controlled perspective to the play's different chapters. Furthermore, from Molina's testimony, which was highly credible, it is clear that her contribution was presented in a tangible form (Exhibits R and S) and that her ideas, her conceptualization of certain themes of the play, and some of the scenes and characters' names along with their dialogues are either identical, similar or portray a remarkable similarity [27] to the final version.

Accordingly, it is this Court's opinion that regardless of the ultimate revisions to Molina's script, including the change in structure, modification of the dialogue, and the addition of the historical content, that work was substantially utilized and incorporated in the final version of the play (Exhibit A).

After mid-June 1980, the Artistic Committee and Cabrera continued to work on rewriting the script for the play with Molina's limited participation. Accordingly, for the purpose of determining the copyright issues presented, it is necessary for this Court to divide the analysis of the creative process taking place during the summer of 1980, first by discussing the parties' intent at the time the writing of the script was done, and next by reviewing their individual contributions.

## E. THE CREATIVE PROCESS AND THE PARTIES' INTENT

Once Cabrera undertook the task of reviewing and building upon Molina's script, with defendants assistance, the creative process ensued. Cabrera now claims to have been the sole author of the final version of the play with absolute decisional power regarding the conceptualization of the script, its characters, the play's soap opera structure, the dialogues, the different ending in which the protagonist does not die, and the particularity, contrary to Brecht's play, with which the songs and lyrics served the purpose of advancing the action. Although admitting having seen and reviewed Molina's initial script for the first act of the play, which he alleges he refused to direct, he continues to claim that it was discarded. (Tr. July 29, 1994, p. 62, 122; August 8, 1994, p. 37). He also claims responsibility for the scenic design conceptualization. Through his testimony he described the participation of Teatro members as that of providing him with the necessary working tools, and research material, and serving as "sounding boards." He specifically described the participation of defendants Pérez–Garay, Santiago and Gómez as that of providing him with some "feedback."

Throughout his testimony Cabrera denied that the final product was ever achieved through the open and continuous discussion of the script's contents and through consensus. He stated that he occasionally would read portions of the script to third persons to get their reactions and that only once he called for the public reading of the first act. According to Cabrera, when this "reading session" took place, he had invited some persons he knew and whose opinions he respected, including the defendants. Cabrera testified that he presided over the session, did all the reading of the dialogues and presented the lyrics for the songs by humming the musical tones based on the conceptualization he envisioned. This, he claims he did based on his past experience with musical plays. (Tr. August 4, 1994, p. 7).

The defendants, however, presented a more detailed and complex description of the creative process in which they all participated, which essentially took three forms: discussing line by line what was already written; reading out loud the dialogues and receiving everyone's input concerning the lines and the characters' conceptualization; and rewriting a dialogue or segment, and then passing around the suggested changes, which would then be open to further line by line discussion until a consensus was reached. (Tr. July 29, 1994, p. 77, 172–175, 192–194; July 30, 1994, p. 10–13).

---

**27.** Exhibit T contains Molina's handwritten analysis and comparison between her work and the script's final version. The extensive list of similarities and their degree of comparison are far from being fortunate coincidences, nor can they be explained as common popular idiomatic expressions.

According to the testimony of the defendants, it appears that they and all other participants received daily photocopy of the script, containing the latest changes, which was read out loud. After listening to the reading and examining the script, they provided their suggestions. As the dialogues were being read, the script was analyzed, and the dialogues were either adopted, modified or rewritten. At some point, it was apparently decided that further guidance could be obtained from researching the Brecht source, that is, Gay's work, "The Beggar's Opera," which had been originally written in 1929 (Tr. July 29, 1994, p. 48). Pérez–Garay claims having suggested the use of Gay's work in carrying out the adaptation of the play (Tr. July 29, 1994, p. 139).

Accordingly, in 1980, when examining and defining the structure of the play, the parties prepared a chart in order to compare Brecht's, Gay's and Molina's script (Tr. July 29, 1994, p. 47–48). After the comparison and discussion only changes approved by consensus were incorporated in Cabrera's copy of the script from which a later clean draft was transcribed in Cabrera's handwriting (Tr. July 29, 1994, p. 47, 58, 66, 71, 127–128). Cabrera's participation was considered by the defendants to have initially been that of a director, who later on joined the team for review and worked on the script. Molina participated in a limited number of the meetings, during which her work was being discussed (Tr. July 29, 1994, p. 137). After some changes in the play's conceptualization were made, Molina alleges that she once came back to a meetings, where she expressed her agreement with the work done and encouraged the other defendants to go forward (Tr. July 29, 1994, p. 138).

The defendants described their participation as "collective" in nature, inasmuch as they all would "sit around a table and brainstorm" (Tr. July 29, 1994, p. 51). For example, it was decided in this way that songs and dialogue needed to be added to the script and that more historic references to the 1950's were required. From the evidence presented, there is no question also that Cabrera, as well as the defendants, was very familiar with Puerto Rico during the decade of the 1950's. As a matter of fact, Pérez–Garay's opinion was that she and Cabrera participated most actively during the next three months until the script for "Pedro Navaja" was finally concluded. (Tr. July 29, 1994, p. 56).

In order to conclude the task, the group claims to have met over a two to three month period and worked for approximately ten or twelve hours a day, usually beginning around 10:00 a.m. and ending around midnight (Tr. July 29, 1994, p. 53–54). The co-defendants gave similar versions of the events. For example, Molina described the revision process of the script as something jointly accomplished by the parties. She also described the work-setting at the Rexach Theater, the fact that each member had a copy of the script to work with, the sporadic collaboration of others, and the fact that Cabrera, a participant in the process, at all times would write the agreed version on his draft from which a clean copy would then be prepared in Cabrera's handwriting (Tr. July 29, 1994, p. 174–175, 192).

Gómez similarly described his role as co-author and claimed to have worked with the codefendants for approximately ten hours a day and having assisted in preparing an outline or synopsis of the scenes and its characters. He described that throughout the daily working sessions, Cabrera, as the director, would decide the daily tasks, then they would proceed to try out a dialogue, give suggestions, and debate to reach a consensus. Having achieved a consensus, Cabrera would write the agreed-upon revisions in a clean copy. He stated that whenever someone was either late or absent from the working sessions, the work completed would be shown to that person for approval. If disapproved, the product was discarded and the subject reopened for discussion. Gómez testified that the same process was followed for writing the lyrics of the songs. (Tr. July 30, 1994, p. 11–15).

It should be noted that most of the witnesses for the plaintiff such as González–Gierbolini, Rosaly, and Mejías commenced their participation in the play upon the conclusion of the creative process, or at least after the completion of the script for the first

act. Most of them understood Cabrera to be the sole author mostly because of publicity to that effect, but had no personal knowledge. (Tr. August 4, 1994, p. 24–27; Tr. August 8, 1994, p. 8–10).

González–Gierbolini testified to having been recruited by Cabrera to perform a character whose dialogue was allegedly specially written for him. At his initial interview with Cabrera he claims to have received the script of the first act of the play, discussed its dialogue and the conceptualization of certain scenes with Cabrera, whom he afterwards saw on different occasions either writing, editing or destroying and rewriting different portions of the script. He testified to seeing and reading from Cabrera's manuscript while it was being typed, and to providing assistance to Cabrera regarding scenes in the play whose contents involved legal aspects and controversies. He recalled that rehearsals under Cabrera's direction had began in July, 1980 at a time when only the first act was concluded, and Cabrera was still working on and writing the second act.

Cruzado, who as the Theater Administrator spent his day at the Theater, expressed that although he had seen Cabrera working alone, he had occasionally also seen members of Teatro sitting and working with Cabrera.[28] Cruz–Solá, who frankly admitted not having knowledge about authorship disputes among the parties, clearly stated that members of Teatro were the ones with the original idea to produce this play using Blades' song and had considered Cabrera to direct the work. Later on, she admitted having assisted Cabrera as a consultant and that even though the arrangements to get her assistance were done by Mrs. Ríos, Teatro's Director in Public Relations, it was Cabrera who she saw working on the script and to whom she provided her assistance. (Tr. August 4, 1994, p. 31–35).

Defendants' cooperation with Cabrera while the script was being written is evident from Rivera–Toledo's testimony. Having never before met or talked to Cabrera, he provided Pérez–Garay, and through her, all those involved, with instructions on how to write lyrics to which music could be added. Later on, upon being provided by Pérez–Garay with the lyrics, he wrote the music for the songs on the play. (Tr. July 30, 1994, p. 57–59, 61–63).

There is no question that the defendants were knowledgeable of the play and its conceptualization. Moreover, because prior to Cabrera's substantial input, they already had a draft for the first act, Blades' authorization to use his song, and had recruited other collaborators needed to accomplish the final production, this Court concludes that defendants' participation was real, effective and crucial throughout the writing of the script. Molina, although not in writing, had allowed Teatro to use her script of act one, which like the contributions of Rivera–Toledo and Blades, was incorporated into the final product prepared by Cabrera as he was assisted by the defendants.

The importance of defendants' collaboration, now diminished by Cabrera, can also be assessed through Cabrera's own statements to the news media during one of his interviews in 1981 while the play was being presented. Then, he described the play as the result of a "collective work," where the dialogue was written, the situation or scenes were then discussed among the members, and his work was that of guiding or structuring the working sessions. During that interview he further acknowledged his "great, hardworking and enthusiastic" collaborators, namely the defendants, who had undertaken the task in a serious and responsible manner. He admitted to having been "nurtured" by the defendants, and from "their contribution," as any writer would have been from the experience.[29]

28. Cruzado remembers that once he was asked to obtain and did obtain the Litanies to the Catholic Rosary, which he delivered at a joint meeting of the members of Teatro and plaintiff. (Cruzado, Tr. August 4, 1994, pp. 39 and 42).

29. During the same interview, Cabrera seems to implicate the existence of some type of agreement, which he now denies, to the effect that Teatro could continue staging the play as long as Teatro wanted and that he (Cabrera) could present it in the United States (Exhibit 9). The Court does not now determine the scope, or even existence, of such an agreement. Instead, this Court focusses on each party's rights based upon their

Based on the evidence presented and considering the type and quality of the work produced over a three-month period of time, this Court is of the opinion that Molina's work provided the basis for the final version of the script, that the task of rewriting, editing and completing the script was given to Cabrera as it was once given to Molina, and that it was Cabrera who undertook and completed the task with defendants' continued full support and collaboration. It is also evident that the defendants and Cabrera had the common and joint intent to stage an attractive musical play that would provide the needed economic funding to purchase the Rexach Theater, and that all worked towards that common goal.[30]

Defendants' theory of the play being written by "consensus," however, is fragile. The claim that at all times all defendants were present and worked together in solving differences is contradicted by the testimony of those defendants who admitted to holding another regular full-time job during that same period of time. Defendants' assertions seem less plausible unless they would be willing to admit that whenever differences existed, it was Cabrera's opinion and decision which prevailed.

Moreover, none of the defendants, except Molina, was able to identify any relevant fragment of the play as something they had actually written. Instead, all co-defendants provided Cabrera with information, ideas, materials and expert assistance that was necessary, but not identifiable in the final version of the play.

On the other hand, Cabrera asked for and was provided with a place where he could work, (Tr. July 29, 1994, p. 46) was seen there by himself almost all the time, personally consulted persons such as Cruz–Solá, was free to write, eliminate and rewrite portions of the script, asked for specific additional historical information or data needed, created entirely new and original characters for

the play such as "El Lince" (The Lynx) and "Glostora," and implemented the conceptualization of a soap opera. As acknowledged by Texidor, it was Cabrera who even decided on the daily tasks and the way in which those tasks ought to be carried out. Furthermore, since 1980, when the play was originally presented, all playbills, record jackets and publicity campaign, alluded to Cabrera as the scriptwriter and director. The defendants were credited as "script consultants".[31] Whenever paid, authorship royalties were paid to Cabrera. The co-defendants have been paid as actors and actresses, as directors and stage designers, and for administrative, technical or clerical tasks performed (Exhibits D—F1, 1—3 and 6—8).

Defendants' point of view that the script was produced by consensus only finds support when it is considered that they were always aware and knowledgeable of the script's progress, provided their suggestions, perhaps even proposed written versions of fragments or lines on the script, and participated in the discussion of Molina's script and Cabrera's work. However, not all defendants were present at all times, Cabrera used to work alone, as when he was seen by Cruz–Solá, Carmen Rivera and Gonzalez–Gierbolini, and Cabrera also kept working on his own while on a trip to the Dominican Republic (Tr. August 4, 1994, p. 76–82). If whatever was written by Cabrera had to be discussed with all members of Teatro, and everything had to be approved by consensus, completing the task over a two to three month period would have been a titanic project. It seems that defendants' awareness of Cabrera's expertise and skills in the media, combined with the respect and admiration they felt towards him, were factors that certainly and understandably would have led them to accept Cabrera's guidance and determinations concerning the script's contents, structure and conceptualizations.

---

participation in the creative process, their individual contributions, and their intent.

**30.** As discussed later in this Opinion, however, this joint intent to stage a production, must be distinguished from the joint intent to become co-

authors under the provisions of the Copyright Act.

**31.** The only person publicly credit as "script consultant" who admittedly was not one, was Belén Ríos. (Tr. August 2, 1994, p. 35, 65–66).

As a matter of fact, no evidence was presented concerning arduous, strong, or extensive discussions regarding any subject on the play. What could be concluded from the defendants' statements, responses, reactions and demeanor in Court was that the group actively assisted Cabrera in the manner previously described, and that due to the respect and admiration that all defendants had towards Cabrera and his talents, it was not difficult for the group to reach a "consensus" by approving the suggestions and work being done by someone who guided the group's work and was responsible for taking essential decisions.

### F. THE CREATIVE PROCESS AND THE DEFENDANTS' CONTRIBUTIONS

Since the writing of the script, its scenic and lighting design, the recruitment of collaborators, auditioning, costuming and the administrative and technical aspects demanded by the rehearsals and staging of the play, were events almost simultaneously occurring, the defendants had an active, crucial and primary role in staging the play. There is no doubt that the members of Teatro had the intent to produce and present an attractive play and that they came up with the idea for the play and its conceptualization. Also, the members of Teatro were responsible for all administrative and staging expenses. However, no claim or evidence was ever presented to establish that authorship rights belonged to Teatro because the play was a work for hire.[32] To the contrary, when specifically questioned Pérez–Garay, stated that "Pedro Navaja" was not a work for hire (Tr. July 29, 1994, p. 98), meaning that Teatro could claim no property right in the play..

The determination of defendants' individual and/or collective collaboration, is at issue in determining whether a copyrightable contribution exists. Based on their own testimonies, their individual collaboration consisted of the following:

In 1979, Pérez–Garay not only proposed the idea of using Blades' song, "Pedro Navaja" to create Teatro's musical play, but recruited Molina to write the adaptation, reviewed Molina's initial manuscript, recruited Cabrera to direct it and Rivera–Toledo to write its music, obtained Blades' authorization to use his song, lead the Artistic Committee's meetings while reviewing Molina's script, participated in the script conceptualization, and arranged for a place where Cabrera could work and where they could provide him with assistance (Tr. July 29, 1994, p. 29–31, 36–42, 46–47). Pérez–Garay further participated by playing the starring female role on the play, during the auditions and cast recruitment (Tr. July 29, 1994, p. 15–16). Throughout almost all playbills, she was credited as either "script consultant" or "collaborator in dramaturgy" and occasionally, she was also responsible for the costumes design (Exhibits D, E, F, F1, and Exhibits 2, 3 and 7).

Molina was asked to write the script, but aside from participating in several meetings where her script was discussed, her collaboration can be accurately defined as that of writing the script for the play's first act (Tr. July 29, 1994, p. 156–158, 161–162, 172–173, 192). She was able to identify her initial manuscript and a revised copy of the first act. Furthermore, as portrayed in Exhibit T, she was able to work on and prepare a comparative analysis among her initial manu-

---

**32.** A "work made for hire" is—

    (1) a work prepared by an employee within the scope of his or her employment; or

    (2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire. For the purpose of the foregoing sentence, a "supplementary work"

is a work prepared for publication as a secondary adjunct to a work by another author for the purpose of introducing, concluding, illustrating, explaining, revising, committing upon, or assisting in the use of the other work, such as forewords, pictorial illustrations, maps, charts, tables, editorial notes, musical arrangements, answer material for tests, bibliographies, appendixes, and indexes, and an "instructional text" is a literary, pictorial, or graphic work prepared for publication and with the purpose of use in systematic instructional activities.

17 U.S.C. § 101.

script and the play final script (Exhibit R and S). Exhibit T portrayed those portions of the script that, albeit of the possible change in the character's name, were still identical, similar or presented the same theme or conceptualization (Tr. July 29, 1994, p. 180–183).[33] In identifying the portions on the final script that were either similar or identical to her work, she has created three different areas of comparison:

a) one concerning the theme or story line which is the same in both Exhibit R and A: a couple whose daughter goes off with a thief, and joins a group of thieves, bandits and prostitutes;

b) several similar scenes or situations;

c) many lines and dialogues and over five names of characters which are either identical or were slightly modified (Tr. July 29, 1994, p. 181–184). (*See* p. 10, Exhibit A and p. 7–10, Exhibit R).

Molina further claims having helped Santiago in writing some of the lyrics for the songs. Tr. July 29, 1994, p. 75.[34] Exhibits F, F1 and # 2, which are the playbills distributed during different presentations of the play credit Molina's "preliminary work in the script."

Gómez, on the other hand, testified that during the performance of the play he participated as a co-author, executive producer of the music and actor in the role of Pedro Navaja. In describing his particular collaboration he indicated that the play was the group's contribution to Teatro, the entity that was responsible for paying the staging costs and its members were the ones who provided the idea for the play (Tr. July 30, 1994, p. 38–39, 45, 51).

Although in Exhibits D, F, F1, No. 2 and No. 7 he was publicly credited for his work as "script consultant" or "collaborator in dramaturgy" Gómez was unable to particularize his contribution. (*See* Exhibits D, F, F1, 2 and 7). He testified "we all included ideas

into the program. Once the script was finished it was Pablo's (Cabrera) job to rewrite the script on a clean copy ... and then we would go through all other aspects of the presentation." (Tr. July 30, 1994, p. 15).

Gómez was responsible for organizing the auditions, publicity and administrative tasks such as payment of salaries. The auditions were conducted by Cabrera as the director, with the assistance of Rivera–Toledo and co-defendant Pérez–Garay, who acted in an advisory capacity as associate director. Gómez further testified that Cabrera and Pérez–Garay did take charge of the costumes, that he participated in designing the metric of the songs and worked with Texidor in the scenic design.

Co-defendant Santiago participated in the discussions where the Artistic Committee developed the play's conceptualization, that is, its time frame, decided on the use of historical events that could be easily identifiable through the different decades of the Puerto Rican history and how the sub-theme of Brecht's play—the misery—could be presented. He shared his ideas, listened and commented to Molina's ideas while she was writing the initial draft of the adaptation. He further claims having suggested the work be commissioned to Molina.

Santiago never claimed or was able to identify any lyric, song, phrase or dialogue of the script as his, but claims co-authorship inasmuch as he actively participated in the working/writing sessions where everyone, including Cabrera, was putting "his best mind to work in the interest of creating what we were creating" (Tr. August 3, 1994, p. 19, 29). The only specific identifiable contribution found on record is that of having provided a photograph of his father "wearing an outfit and hat which was later used to create the image Pedro Navaja." The photograph was also used throughout the publicity campaign (Tr. July 29, 1994, p. 158).

---

33. In Exhibit T, the portions identified by "PN" correspond to those contained in Exhibit A (final script of the play), and the sections identified under the caption "Original" correspond to Exhibit R (Molina's first draft of the script).

34. No evidence was presented as to whether the group members, aside from Santiago, had any knowledge of Molina's alleged collaboration. Molina never kept any written copy of what she and Santiago had written (Tr. July 29, 1994, p. 207) and has failed to identify lyrics that she could have written.

Santiago and his codefendants never received authorship royalties but were paid rather for the administrative and technical tasks performed during the presentation of the play. Throughout the staging of the play he was credited for participating in publicity and also as a "script consultant." (Exhibits F, F1 and 2).

Texidor participated in the "reading sessions" while the group was working on the script, provided ideas and suggestions that were discussed until a consensus could be reached (Tr. August 2, 1994, p. 110–112). Texidor claims to be the owner of the scenic design of the play, and that its conceptualization began at the same time he was participating with the group in the process of writing the script. He admitted having prepared a sketch of his design, which was of his own inspiration and having submitted it for the Artistic Committee's approval. Later on, he also admitted receiving ideas and suggestions from the members of the Committee and from Cabrera as well (Tr. August 2, 1994, p. 116–119). Accordingly, he was publicly credited mostly for his stage design and several other occasions for being a script consultant (Exhibits D, F, F1, No. 2 and 7).

He further testified that he considered Cabrera a co-author and not the sole author, because Cabrera never walked in with his work, but had rather joined the Artistic Committee on their work in drafting the script for the play (Tr. August 2, 1994, p. 116–120).

Texidor specified having performed as set or scenic designer in all public staging of the play, except for the one occasion it was presented in Cuba. When the play was staged in Venezuela, he was paid by the Puerto Rican Institute of Culture for his work as stage designer (Tr. August 2, 1994, p. 122–123).

In attempting to specifically identify his contribution to the script Texidor limited himself to state that "it was very little because the work was done basically on the basis of consensus," where the best was selected. Texidor specifically remembers two lines he had suggested for the character of The Lynx ("El Lince"), which were: "Your hair is falling out," and "Your kid went gay"

(Tr. August 2, 1994, p. 123–124). He was unable to identify any other portions, phrases, or lyrics of songs (Tr. August 2, 1994, p. 139).

Although by June 30, 1992, he and other co-defendants prepared a sworn statement saying he was one of the participants on the collective work done for and on behalf of Teatro, he admitted as all other codefendants did, having never before claimed to be a co-author or to ever objecting to Cabrera appearing as the sole author (Tr. August 3, 1994, p. 127, 132, 148–149, 153) (Exhibits No. 30–32). However, in 1989, when Texidor learned that the play was to be staged by a different private producer with whom he then had a working relationship, he immediately objected to it by asserting that Teatro had reserved all rights for *staging* the play in Puerto Rico and that he had ceded to Teatro his staging rights (Tr. July 29, 1994, p. 92–94; August 2, 1994, p. 126–127). This, appears to have been the event that triggered the existing conflict.

As shown by the evidence presented, Teatro, as a corporate entity, had talented people among its members who devoted years of hard work to the theater media and to teach new artists and create new plays. Because of its well-known image and reputation Teatro successfully managed to and did recruit qualified and talented persons in different facets of the theater that would donate their work and occasionally their rights over their creations. Most of the time Teatro would never be expected to pay for such works but rather would cover expenses, and registration fees. In this case, Molina was recruited as a scriptwriter but never paid as such, nor was she an employee or member of Teatro. She acted as in one previous occasion, as a collaborator for Teatro (Tr. July 28, 1994, p. 98).

In the instant case, the defendants' collaboration encompassed providing ideas regarding the play's theme, its conceptualization, time frame and historical background. More specifically, the only evidence presented is to the effect that some provided phrases, lines for the dialogues of the characters and perhaps for the lyrics. However, none of the

defendants except Molina was capable of identifying specific portions of the script that could have been written by them.

### G. THE CO-AUTHORSHIP RIGHTS CLAIM AND THE DOCUMENTARY EVIDENCE

To substantiate and corroborate their assertions the parties presented extensive documentary evidence. From the documents it can be determined that the theater play "Pedro Navaja" was originally presented in September, 1980. Since then, in all playbills, and record jackets alluding to the play, Cabrera has times appeared as scriptwriter and director. The defendants have always appeared as collaborators in dramaturgy. (Exhibits E–F1, 1–3, 6–8, 22 and 24) and have received credit for their respective technical, administrative and artistic support.

Before staging the play, Teatro sought and obtained written authorization from Blades and Rivera–Toledo, to use their respective works, the song "Pedro Navaja" and the music to the lyrics on the plays. Nevertheless, in spite of defendants past experience in works of collective creation, the members of Teatro never sought Molina's written authorization to use her work or to have her rights over the same transferred to Teatro. (Tr. July 29, 1994, p. 118–119, 186, 123). On March 12, 1981, Certificate of Registration PAU–276–120, was issued under the name of Pablo Cabrera (Cabrera). The fees, application and filing procedures to obtain such certificate were either paid or carried out by Teatro. Nevertheless, Cabrera is the only person who has received authorship royalties.

It is not until May, 1989, when the defendants learned that the play was to be presented in Argentina and approached Cabrera trying to ascertain if he had authorized the play's presentation by an independent and different producer in Argentina, without giving them prior notice. All subsequent written communications between plaintiff and co-defendants contain the parties' respective positions, presumably anticipating the possibility of future legal claims. (Exhibits G–L). All subsequent conversations between the parties were fruitless but, inasmuch as the intended 1989 presentation of the play in Argentina never materialized, no legal claim ensued.

However, the defendants, based on this experience, decided to act to either protect or claim what they considered to be their authorship rights. On May 26, 1989, for the first time, they requested the Copyrights Office to provide a complete copy of the file for the musical play "Pedro Navaja" (Exhibit U) and thereafter, during 1992, Teatro prepared affidavits from almost all claimants to have the play registered as the intellectual property of Teatro before the Commonwealth Department of State (Exhibits 30, 31, 32, and 33). (Tr. July 29, 1994, p. 141–146). Also additional attempts were made to submit "amplified information" to the United States Copyrights Office and obtain a new registration certificate (Exhibit 28–29). However, for submitting unclear information, their application was returned by the U.S. Copyrights Office, with specific instructions for the correct filing of the form (Exhibit 28). (Tr. July 29, 1994, p. 101–102). Once corrected and clarified the application was re-submitted and on February 2, 1993, a new supplementary registration certificate, No. PAU–1–806–555 was made effective.

### H. EXPERT TESTIMONY

In addition to extensive documentary evidence the parties presented the testimonies of expert witnesses.

The defendants presented the testimony of José Ramos—Escobar (Ramos)[35]. The

**35.** Ramos has a Bachelors degree in Theater and Comparative Literature form the University of Puerto Rico a Masters and Ph.D. in Comparative Literature, majoring in dramatic literature, from Boston University. He has performed as theater director and professor at the Drama Department at the University of Puerto Rico and has authored nine plays, two novels and a short story book. He has written articles of literary criticism for numerous magazines in Puerto Rico and abroad. (Tr. August 3, 1994, p. 76–156).

plaintiff presented that of Rosa L. Márquez (Márquez)[36] and Myrna Casas (Casas).[37]

Ramos and Márquez testified as to the general roles and distinctions between an author of a play and its director. The gist of their testimony consisted in defining the creative process of a "collective work" and when is it to be considered the product of "joint authorship."

Ramos claimed that the creative process described by the defendants, which required "consensus", constituted a collective work that resulted from the parties joint authorship. Márquez refuted such classification inasmuch as there had been no "improvisation" during the process. For Márquez, the play was not a work of joint authorship since there was no improvisation but rather discussion of ideas and research of pre-existing sources of information.[38] Márquez' opinion was that the script could have only have been written by one governing mind and could not have been the product of a collective process as the one described by the defendants.

Ramos, the defendants' expert, considered that a work is the result of a collective process once all writers and collaborators agree on an idea or project and it is carried out through the collective effort of all its participants. While acknowledging that the collective creation process can be instrumented in different ways, he specifically described a variance and methodology through which, as in this case, the group may invite writers, directors and/or actors to participate with them, producing a collective work over which later on, the director could have a preponderant role. He stated that since the 1990's directors have been vested with increased responsibility and freedom in staging and discretion in making reinterpretations of the plays, facts that in sum, although source of serious conflicts with the author(s) for the play, does not transform such a director into a co-author (Tr. August 3, 1994, p. 82–86).

Ramos understands that no given percentage of participation in a work is needed to be a co-author and that the co-authorship will be determined by whether the individuals' contribution appears or not in the final product. He further understands that the collective creation process that may confer co-author status to its participants, must entail the participation of several individuals, which may participate in the creation and decision-making process even by merely giving his ideas and opinions via consensus (Tr. August 3, 1994, p. 93–97). In his opinion, "Pedro Navaja" is a work of collective creation where all those who participated are to be considered co-authors.

The concepts expressed by Márquez and Ramos are not significant to the legal issues at hand, inasmuch as in defining the concepts of "collective work," "author" and "co-authorship," both experts have omitted important statutory requirements such as "intent" and "copyrightability."

Casas, plaintiff's expert in comparative literature, testified to having examined the three plays in which Cabrera was either the author or co-author. Based on her experi-

---

**36.** Márquez is a full professor at the Drama Department of the University of Puerto Rico since 1990, and a professor since 1978. She obtained a B.A. in Humanities majoring in drama from the University of Puerto Rico, a Masters in Arts in Theater and Education at the University of New York, State of New York and a Ph.D. in theater and drama majoring in Contemporary Latin American theater from the Michigan State University. She also holds post doctoral studies from the New York University. (Tr. August 8, 1994, p. 111–144).

**37.** Casas has a Bachelors in Art, with a Major, in Drama from Vassar College, a Master of Fine Arts in Theater, from Boston University and a Ph.D. in Theater Education from New York University. In addition she has special studies in play writing from Harvard University and the Hispanic Cultural Institute, Madrid, Spain. (Tr. August 9, 1994, p. 144–170). Her professional experience consists of over thirty-one years of experience as a producer, director, full professor in acting, dramatic literature and avantguard theater. She testified with the acquiescence of the defendants, as an expert in comparative literature, theater composition and originality in play writing.

**38.** In Márquez opinion, through the methodology of improvisations, an actor or individual may propose a character and/or a given situation that is later developed by the improvisations of others. While this improvisation is taking place, the source material and information is accumulated and the contents and context of the improvisation is recorded. The resulting product of such improvisations is considered then, a "collective product" of "joint authorship." (Tr. August, 1994, p. 123–127, 135).

ence and expertise, she concluded that the use of idiomatic, popular expressions, slang, and structure of the play "Pedro Navaja," absolutely corresponded to Cabrera's literary style which was extremely well known to her. Casas' testimony however has to be carefully scrutinized inasmuch as Cabrera had only written one piece of literary work prior to the musical play "Pedro Navaja."[39] Under such circumstances, the weight of her testimony has to be balanced and determined in conjunction with other available evidence, for it would not be unwise for an author, in this case Cabrera, to reutilize a writing style that had proven to be successful and well accepted by the public.

However, Casas was also able to identify additional elements to the musical play besides the characters' use of language and idiomatic expressions upon which to base her conclusion. This Court attaches full credibility to her analysis and identification of elements such as: the creation of the psychology and character of "The Lynx," a totally new character set in 1980, that narrated a soap opera of the 1950's; the faithful description of the Puerto Rican sociocultural background throughout the play, which is compatible with Cabrera's educational background and employment history; the innovative adaptation of the script of a theater play to television soap opera, media in which Cabrera's expertise is unrefuted; and the efficient utilization of the elements of a musical comedy, media in which Cabrera had ample professional experience. All these aspects made Cabrera's presence evident in the conceptualization of the structure for the play (Tr. August 8, 1994, p. 156–157). Casas further considered that the character of Pedro Navaja was of new inspiration and creation. Although still being a crook, like Macheath in Brecht's play, Cabrera's character portrayed redeeming qualities such as all those with "starring roles in soap operas." Those qualities produce, as they did in "Pedro Navaja," a happy ending.

**39.** *Prior to "Pedro Navaja," Cabrera had written the script for "Eleuterio, el Coquí," and thereafter was the scriptwriter of two theater plays that somehow, in the use of slang and idiomatic expressions resembled "Pedro Navaja."*

**40.** *A "derivative work" is "based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording,*

## III. DISCUSSION

The legal issue in the instant case can be framed as whether Cabrera, who since 1981 holds Certificate of Registration No. PAU 276–120, is indeed the sole author of the "derivative work"[40] "Pedro Navaja", or whether the defendant members of Teatro are co-authors of that play.

In order to determine whether a piece of work is the product of sole or joint authorship, concepts such as copyrightability, originality and intent within the Copyright Act of 1976 (the "Act") must be clearly understood.

Obtaining copyright protection under the Act requires the satisfaction of two basic elements: (1) an original work of authorship; and (2) its fixation in a tangible form. 17 U.S.C. § 102.

■ A work of authorship is considered "original" if the work owes its origin to the author or authors, and if it possesses at least some minimal degree of creativity. *See Feist Pub. v. Rural Tel. Serv.*, 499 U.S. 340, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). Moreover, a work is fixed in a tangible form when it is has "an authorized embodiment that is sufficiently permanent or stable, permitting the work to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." H.R.Rep. No. 94–1476, 94th Cong., 2d Sess 51 (1976), reprinted in 1976 U.S.Code Cong. & Admin.News 5659, 5664 at p. 53. *See also Ashton–Tate Corp. v. Ross*, 916 F.2d 516, 521 (9th Cir.1990); 1 Paul Goldstein, *Copyright: Principles, Law and Practice*, § 4.2.1.2 (1989).

A "derivative work" such as "Pedro Navaja," qualifies for copyright protection although its protection

extends only to the material contributed by the author of such work, as distinguished

*art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed or adapted."* 17 U.S.C. § 101. Both parties have testified, and it is an uncontested fact, that the play in controversy is an adaptation of Brecht's "Three Penny Opera" and Gay's "Beggar's Opera." As such, it is referred to as a derivative work.

from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material. The copyright in such a work is independent of, and does not affect or enlarge the scope, duration, ownership, or subsistence of, any copyright protection in the preexisting material.

17 U.S.C. § 103(b). "This analysis is based upon the premise that the one pervading element prerequisite to copyright protection regardless of the form of the work is the requirement of originality—that the work be the original product of the claimant." *Weissmann v. Freeman*, 684 F.Supp. 1248, 1260 (S.D.N.Y.1988) (citing *L. Batlin & Son v. Snyder*, 536 F.2d 486, 489–90 (2d Cir.1976), quoting 1 *Nimmer on Copyright*, § 10 (1975)).

The Act specifically recognizes that more than one person may be attributed authorship to a particular work. The Act defines "joint work" as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101.

■■■ In a joint work, the joint authors hold undivided interests in a work despite any differences in the quality or quantity of each author's contribution. 17 U.S.C. § 102. Each author is therefore a co-owner of the copyright. Hence, every author maintains the right to use or license the work, subject only to an accounting of any profits to the other co-owner. *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1068 (7th Cir.1994); *Childress v. Taylor*, 945 F.2d 500, 505 (5th Cir.1991). In addition, any relinquishment by an author for the use or license of a work is required by the Act to be in writing.[41] Therefore, oral agreements relinquishing the use or license of a work are invalid.

In the instant case, the plaintiff alleges to be the sole author of "Pedro Navaja," while the defendants claim to have jointly participated in the creation or writing of the script for the play thus being co-authors with proprietary rights. Although the defendants were either members of the Artistic Committee or collaborators of Teatro who wanted to produce and stage a musical play in order to assure the company's future activities and raise the necessary funds to buy the Rexach Theater, there is no evidence that Teatro, ever had any ownership rights or that they ever transferred to Teatro any such rights.[42]

■■ Although a plain reading of Section 101 of the Act may give the impression that a participant's collaboration in a work may be determinative of authorship, it is the intention of the parties at the time of the creation, which is the controlling element in determining whether a work is a joint work for purposes of the Act.

[A] work is "joint" if the authors collaborated with each other, or if each of the authors prepared his or her contribution with the knowledge and intention that it would be merged with the contributions of other authors as "inseparable or interdependent parts of a unitary whole." The touchstone here is the *intention, at the time the writing was done,* that the parts be absorbed or combined into an integrated unit . . .

*See* H.R.Rep. No. 94–1476, 94th Cong., 2d Sess. 120, reprinted in 1976 U.S.Code Cong. & Admin.News 5659, 5756; S.Rep. No. 473, 94th Cong.; 2d Sess. 103 (Support in Congress was so great that both houses issued virtually identical reports).

As stated by Congress, the statute clearly requires a focus on the intention to collaborate at the time the writing is done. The requirement of contemporaneous intent at the time of writing may create problems in cases, such as the one at bar, in which the parties have collaborated in some sense of

---

**41.** Title 17 U.S.C. § 204(a) states:

**Execution of transfers of copyright ownership** (a) A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, *is in writing and signed* by the owner of the rights conveyed or such owner's duly authorized agent. (emphasis added).

**42.** A "transfer of copyright ownership" is defined by the Act as "an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, but not including nonexclusive license." 17 U.S.C. § 101.

the term but are at odds as to whether or not there was mutual intent to create a joint work. Nevertheless, although "it is hard to imagine activity that would constitute meaningful 'collaboration' unaccompanied by the requisite intent on the part of both participants that their contributions be merged into a unitary whole, the case law has read the statutory language literally so that the intent requirement applies to all works of joint authorship." *Childress*, 945 F.2d at 505–6.

■ This Court believes, like the Courts of the Second Circuit in *Childress*, and the Seventh Circuit in *Trinity*,[43] that the language of the statute clearly requires that each author intend at the time that their respective contributions were made, that their contributions be merged into a unitary whole. Absent such a requirement, "seldom would an author subject his work to pre-registration peer review ... for those seeking copyrights would not seek further refinement that colleagues may offer if they risked losing their sole authorship." *Trinity*, 13 F.3d at 1069. This Court is convinced that no author would seek further ideas, suggestions, and improvements of his work if he was forced to gamble losing his status as sole author.

■ In addition to determining the intent of the parties, this Court must also ascertain whether the defendant's contributions are copyrightable. Actually, courts and copyright commentators have differed as to whether a contribution must be copyrightable to make the contributor a joint author of the work.

Professor Nimmer's "de minimis test" and Professor Goldstein's "copyrightability test" are the two basic tests that have been examined by courts and commentators when evaluating the contributions of authors claiming joint authorship. The "de minimis test" requires that the combined product of the joint efforts must be copyrightable. In contrast, the "copyrightability test" requires that each author's contribution be in and of itself copyrightable.

These two tests must be viewed not only in light of advancing the purpose of the Act, that is "to promote the Progress of Science and useful Arts," but they should also further the goals of administrative and judicial efficiency.[44] U.S. Const. art. I. section 8, cl. 8; *see also Trinity*, 13 F.3d at 1069 (citing *Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 350, 111 S.Ct. 1282, 1290, 113 L.Ed.2d 358 (1991)). It is in order to further these goals that the Act does not

**43.** In *Childress*, defendant Taylor, an actress, after portraying the legendary black comedienne Jackie "Moms" Mabley in an Off–Broadway skit, interviewed Mabley's friends and family and collected research on the comedienne. Thereafter, Taylor approached plaintiff Childress in order to turn her research and ideas into a script. After initially rejecting Taylor's proposal, Childress agreed to write the play and Taylor turned over her research to Childress. Although Taylor acknowledged Childress actually wrote the play, she nevertheless argued that because she had discussed the play's conceptualization with Childress on a regular basis and had suggested the inclusion of various scenes and characters in the play, she was a co-author.

Upon Taylor's performance of the play without Childress' authorization, Childress sued for copyright infringement. Taylor rebutted that she was co-author of the play. The District Court granted summary judgment, and the Appeals Court upheld the decision in Childress' favor, holding that all joint authors must make a copyrightable contribution, and that the putative authors must share at the time the work is done the intent to be co-authors. In essence, it was held that Taylor's contribution—ideas and research—had been produced prior to Childress writing the play.

Similarly, in *Trinity*, plaintiff Erickson, the author of three plays brought an action to prevent defendant Trinity Theatre from performing her plays using two videotapes to which she owned the copyrights. The Trinity Theatre actors alleged that they were joint authors under the Copyright Act since they had made suggestions and collaborated with Erickson while she was writing her scripts. The Seventh Circuit affirmed the lower court's ruling that the parties were not joint authors as to two of the videotapes. The Seventh Circuit affirmed the need to find that "the parties intend to merge their contributions into a uniform work." 13 F.3d at 1068.

**44.** The concept of judicial economy often enters the analysis of whether to adopt or maintain a given rule or test. *See e.g., Ankenbrandt v. Richards*, 504 U.S. 689, 704, 112 S.Ct. 2206, 2215, 119 L.Ed.2d 468 (1992) (stating that concerns of judicial economy weighed in favor of excluding family law questions from diversity jurisdiction); *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991) (weighing interests of predictability and judicial economy).

protect ideas, but only the expression of ideas.[45]

The "de minimis test," has not found support in courts which have specifically addressed the copyrightability issue. The requirement that "more than a word or a line must be added by one who claims to be a joint author," 1 *Nimmer,* § 6.07 at 6–21, lacks the pragmatic approach that a trier of fact requires in order to resolve a co-authorship conflict. Moreover, it goes against the Act's proposition that "ideas" alone are not to be afforded copyright protection.[46] To require that a contribution to a work simply be "more than a word or a line" creates a nebulae of ambiguousness providing virtually no guidance to a trier of fact regarding whether or not a contribution rises to the level of joint authorship. This Court finds the *Trinity* analysis and rejection of the "de minimis" test sound.

■ Professor Goldstein's "copyrightability test" has been adopted by the majority of the courts that have considered this issue.[47] Under the "copyrightability test," "[a] collaborative contribution will not produce a joint work, and a contributor will not obtain a co-ownership interest, unless the contribution represents original expression that could stand on its own as the subject matter of copyright." *Trinity,* 13 F.3d at 1069, citing Paul Goldstein, *Copyright: Principles, Law, and Practice,* § 4.2.1.2, p. 379 (1989). Goldstein, and the majority of courts which have adopted this position, suggest that each collaborator's contribution must be a copyrightable work of authorship. This Court must agree. "Compared to the uncertain exercise of divining whether a contribution is more than de minimis, reliance on the copyright-

ability of an author's proposed contribution yields relatively certain answers." *Trinity,* 13 F.3d at 1071. Moreover, a copyrightable contribution by all joint authors serves to "prevent some spurious claims by those who might otherwise try to share the fruits of the efforts of a sole author of a copyrightable work, even though a claim of having contributed copyrightable material could be asserted by those so inclined." *Childress,* 945 F.2d at 506.

Although the application of this copyrightability requirement will undoubtedly produce on a case-by-case basis what might be considered at first glance unfair results, absent a copyrightability requirement for contributions to a joint work, the task of identifying what constitutes a valid contribution would be left to the whimsical and subjective moods of different triers of fact, producing only more inconsistency and further unfair results. Because subjective intent is very difficult to prove, the court must be able to point to some objective criteria as manifesting such an intent, such as a copyrightable contribution.

It is for these reasons that this court, aware of the fact that this is an issue of first impression in this district, and an issue which has not yet been addressed by the First Circuit, adopts the majority view on the copyrightability requirement in a joint work.

Therefore, we now turn to the question of whether or not any or all the defendants are co-authors of the play in controversy. Each individual defendant must demonstrate that he or she made a copyrightable contribution to the play, and that the parties intended at the time of creation to regard themselves as

---

**45.** In no case does copyright protection for an original work of authorship extend to an idea, procedure, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work. 17 U.S.C. § 102(b).

**46.** *Feist,* 499 U.S. at 350, 111 S.Ct. at 1290; *Ashton–Tate Corp. v. Ross,* 916 F.2d at 521; *Community for Creative Non–Violence v. Reid,* 490 U.S. at 737, 109 S.Ct. at 2171; *Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. at 547–48, 105 S.Ct. at 2223–24 (1985).

**47.** *Trinity,* 13 F.3d at 1061; *Childress,* 945 F.2d at 507; *Ashton–Tate Corp. v. Ross,* 916 F.2d 516,

521 (9th Cir.1990); *M.G.B. Homes, Inc. v. Ameron Homes, Inc.,* 903 F.2d 1486, 1493 (11th Cir. 1990); *Whelan Associates, Inc. v. Jaslow Dental Lab, Inc.,* 609 F.Supp. 1307, 1318–19 (E.D.Pa. 1985), aff'd. 1984 WL 532, 797 F.2d 1222 (3d Cir.1986), cert. denied, 479 U.S. 1031, 107 S.Ct. 877, 93 L.Ed.2d 831 (1987); *Kenbrooke Fabrics, Inc. v. Material Things,* 223 U.S.P.Q. 1039, 1044–45 (1984); *Meltzer v. Zoller,* 520 F.Supp. 847, 857 (D.N.J.1981); *Aitken, Hazen, Hoffman, Miller, P.C. v. Empire Construction Co.,* 542 F.Supp. 252, 259 (D.Neb.1982).

joint authors. *Trinity*, 13 F.3d at 1068; *Childress*, 945 F.2d at 505.

## A. *PEREZ–GARAY, SANTIAGO, GOMEZ AND TEXIDOR'S CONTRIBUTION*

■ As previously concluded, none of the defendants, except Molina, made a tangible contribution to the play. Although there exists some discrepancy among the defendants as to when Cabrera actually joined the group's "collective" creative process, that is whether or not he joined before or after the main body of work was already completed, it remains a fact that the "contents and structure" of the pre-existing work—that is, the first act—was significantly modified by Cabrera. This court, therefore, cannot conclude that all of the work was almost completed prior to Cabrera's participation. Defendants efforts to distinguish *Childress* as a matter concerning an already completed work submitted to an author are thus unsuccessful.

It is clear, however, from the evidence presented that not only was the first act modified, but that additional research had to be conducted, and a second act with a complete new set of songs created. The fact that the defendants' ideas and contributions were being received by Cabrera while he was still writing the script still does not make this case substantially different from *Childress*, where the defendant Taylor suggested a given scene, lines, or jokes for the script, provided factual data to Childress and conducted some research from which additional information was obtained. As in the instant case, all of this was accomplished while the script was being written.

Nevertheless, as stated in *Childress* and *Trinity*, it is clear that ideas or non tangible contributions, are not copyrightable. Regardless of whether or not the defendants, Pérez–Garay, Gómez, Texidor, and Santiago, may have collaborated to some degree in the "creation process" they nevertheless failed to individually provide an independent copyrightable contribution.

It is clear from the evidence presented that these defendants cannot satisfy the copyrightability requirement adopted by this Court. Whether or not these defendants actually contributed concrete ideas (which are not copyrightable) that were included in the final product or served merely as "sounding boards" is in fact irrelevant in view of the applicability the "copyrightability test." These defendants have not introduced evidence which indicates to the court that they contributed something copyrightable as the "tangible expression of an idea," in accordance with the purpose of the Act and the Supreme Court. Absent this showing, these defendants cannot be held to be co-authors of the product "Pedro Navaja." Having determined the lack of copyrightable contributions of these defendants, the Court need not address the element of intent between Pérez–Garay, Gómez, Texidor, Santiago and Cabrera to be co-authors. Even though these defendants had no copyrightable contribution, there is no doubt however, that they did work and assisted "by giving the best of [them]" in enhancing the contents and quality of the final work.

## B. *MOLINA'S CONTRIBUTION AND INTENT*

■ Because of the extent of her participation in the creative process and her contribution, the claim presented by Molina provokes a distinct analysis. From the evidence presented at trial, it is apparent that Molina was the only defendant who provided the group with a copyrightable contribution. It is undisputed that in 1980, Molina was requested by Teatro to write an adaptation of Brecht's "Three Penny Opera" that would serve as a basis for a play centered on the song by Blades Pedro Navaja, and that did submit at least the first act of the adaptation, which she completed without anyone's assistance.

A perusal of Molina's original first act with that of the final version of the first act of "Pedro Navaja" shows striking similarities in the structure of the act, the use of language, the flow of dialogue and nature of characters. Had Molina's prior work been discarded by plaintiff as he alleges, the extent of similarities between the two texts would certainly

have been far less.[48]

This court finds that the first draft provided by Molina to Teatro is a copyrightable contribution inasmuch as it is an identifiable expression of an idea of a derivative nature. Moreover, Molina was able to clearly identify those portions of her work that remain astonishingly unchanged even in the final script of the play [49] (Exhibit T).

Having determined that Molina's contribution is indeed copyrightable, we turn to the second prong of the joint work test, the party's intent at the time the writing was done. In order for Molina to be attributed the status as a co-author of the play "Pedro Navaja" it has to be determined that she and Pablo Cabrera created the play "jointly" or in other words, produced a "joint work." [50] As discussed above, Molina must have prepared her contribution with the intention that her contribution be merged with that of Cabrera's, to create an inseparable or interdependent unitary whole. *See* 17 U.S.C. § 101.

■ As required by the Act, we focus on the intention of the parties at the time of the creation, which is the controlling element in determining whether a work is a joint work for purposes of the Act. Co-authors need not be temporarily or physically proximate to create a joint work, as long as each intended at the time of creating the contribution that it would either augment or be augmented by later or earlier contributions to form a unitary whole. *Philadelphia Orchestra Association v. Walt Disney Co.,* 821 F.Supp. 341, 347 (E.D.Pa.1993).

■ The court in *Childress,* suggested two factors that could be helpful in making the determination of whether or not opposing parties claiming co-authorship shared the requisite intent. First, it should be determined whether in the absence of a written contract, each party intended that all parties would be identified as co-authors. Second, a court should examine how the parties regarded themselves in relation to the work. 945 F.2d at 508. However, it remains a requirement that all contributors must fully intend to be joint authors. *Id.*

Applying these factors to the case at hand, it is first an undisputed fact that there is no written contract between these two parties establishing that they either intended to be or are co-authors. As to how the parties regarded the themselves, it should be noted that Molina began and ended creating her initial contribution knowing only of the possibility that Cabrera would direct the work. Attaching the idea that Molina intended to be joint author at the time she began to write her adaptation, with an individual whose participation, limited to directing the play, was still not yet confirmed would be too far a stretch of the facts.

Even if this Court were to conclude that the play was created by an alleged collective process whereby all of the decisions were made by a consensus of all of the participants in the group over a few weeks time, Molina's absence during most of that process weakens the link of joint authorship with Cabrera. Even if the existence of such a link could be later assumed from the four meetings Molina did attend after she handed over her first act to the group, she nevertheless is not a joint author because she never intended to be joint authors with Cabrera *at the time* she actually created her work.

---

48. Plaintiff's claim that Molina's work is not "original" inasmuch as it was taken from an Argentinean translation of Brecht's play, is defeated by the testimony of his own experts who testified that adaptations may be considered original works if the time frame, characters, idiomatic expressions, and psychology is changed or if they are adapted to a different historical setting and culture. In this case, there was adaptation to Puerto Rico in the decade of the 1950's.

49. Although the names of the characters may have been changed, much of her dialogue still remains virtually intact. For example, the Mexi-

can character of Jalisco, which the plaintiff offered witness testimony to expound the fact that this was the character he created during his trip to the Dominican Republic, is presented utilizing substantially the same dialogue of Molina's characters Jorge, Jacobo and Roberto. (*See* Exhibits T and 36.) Jalisco appears during both acts of the play.

50. Having failed to contribute a copyrightable contribution, the other defendants are no longer considered possible co-authors.

Moreover, had Molina decided to be a joint author with Cabrera during or after the four meetings she allegedly attended, this still would not be enough to make them co-authors. Although this Court has considered the possibility, given the short period of time (not more than three months) in which all of the events transpired, such a conclusion is nevertheless contrary to the statutory requirement and congressional intent. Molina's copyrightable contribution, was completed by the time these "meetings" or "collective processes" even began, and also before Cabrera's participation as a director was even solidified. No evidence was presented that she contributed anything else, in addition to her original manuscript, during the continuing collective creating process. Furthermore, no evidence was presented to substantiate the assertion that Molina's initial intentions of being the sole author of the play were ever modified, that she ever discussed with Cabrera any changes in the script structure or that she ever submitted any additional copyrightable contribution. What the evidence does reflect is that Molina, was in disagreement with what she witnessed at the few working sessions she attended, decided to abandon the project and the group and destroyed and discarded her manuscript of the second act of the play, on which, by then, she had already worked. It can be inferred from her actions that she abandoned any intention of participating in Teatro's project.

Since at the time she created her contribution she did not specifically intend to be a joint author with Cabrera, and since she afterwards manifested no intent to participate in a collective work with Cabrera, we lack the requisite intent between these two individuals to make them co-authors.

It is worth noting that neither Teatro, nor the Artistic Committee, in its legal capacity, ever received from Molina any written authorization, delegation or transfer rights to use her work. Whatever work was initially done by Molina, continued then to belong to her,

even though her intentions were to allow Teatro to use and benefit from it.

Attaching the idea that Cabrera intended at the time he began either writing or participating with the group to specifically be joint author with Molina, someone with whom he does not even recall speaking during this time is similarly difficult.[51] Furthermore, Cabrera emphatically continues to deny ever having such intention.

## C. CONCLUSION

Upon Cabrera's arrival to Puerto Rico, Teatro's Artistic Committee, prepared to face and did meet the professional challenge of producing and staging a great musical play. They did so by entrusting Cabrera, as they once did Molina, with the task of writing and re-writing the script. It is reasonable to conclude that Molina's version was never discarded but rather utilized by an experienced and knowledgeable individual such as Cabrera, who in conjunction with the collaboration received from members of Teatro, managed to restructure the script (from "acts" to "chapters"), modify existing lyrics, and create new ones. Cabrera, by participating in the early stages of the script writing, managed to absorb the ideas, suggestions and collaboration of experienced and talented contributors, and develop them as part of his (Cabrera's) conceptualization of the characters, the scenes and all other aspects of the play.

While acknowledging Cabrera as the author for the script of the play, it is also clear that the idea, its conceptualization, and the support assistance that was needed was provided by a group of excellent and extremely well qualified professionals, who gave their time, intellectual and emotional energies, and the best of their professional abilities while collaborating with Cabrera and while staging the hundreds of performances of "Pedro Navaja."

Although the strict application of statutory requirements, may have produced what might be considered an unfair result, given the defendants valuable collaboration in the

---

**51.** To the best of Cabrera's recollection, Molina never even spoke to him. Although this is not considered indicative of a lack of intention between the two individuals, it nevertheless lends support to the conclusion that they did not have the requisite intent to be co-authors.

creation the play, this Court is bound to follow and apply the law. Nevertheless, this Court gives total credibility to Cabrera's words to the press in January, 1981, when he acknowledged the defendants continued input and collaboration throughout the creative process and admitted he had "great collaborators [who] were genuinely and seriously committed to the dramatic arts in this country." As Cabrera previously admitted, there is no doubt that he "nurtured himself from their contributions."

## IV. *FINALE*

Although recognizing Teatro's initiative, Molina's substantial copyrightable contribution, and the defendants valuable and dedicated efforts and assistance, this Court cannot attach co-authorship status to the defendants because they either lacked the intent or failed to make a tangible copyrightable contribution.

Accordingly, this court finds that the defendants initially shifted the burden of proof, and Pablo Cabrera met his burden of proving by a preponderance of the evidence that he is the sole author of the play "La Verdadera Historia de Pedro Navaja."

Having determined plaintiff's claim of authorship and his proprietary interest in the play, as agreed by the parties, plaintiff's claim for damages under the Lanham Act, 15 U.S.C. § 1115(a), and under Article 1802 of the Puerto Rico Civil Code, 31 L.P.R.A. § 5141 will be separately addressed.

IT IS SO ORDERED.