T.B. HARMS COMPANY, Plaintiff,

v.

JEM RECORDS, INC., Defendant.

Civ. A. No. 85–2677.

United States District Court,
D. New Jersey.

March 26, 1987.

Alan L. Shulman, Barry I. Slotnick, Silverman & Shulman, P.C., New York City, Lisa M. Palumbo, Young, Tarshis & Dimiero, West Orange, N.J., for plaintiff.

Neil J. Rosini, Barbara S. Ginsberg, Franklin, Weinrib, Rudell & Vassallo, P.C., New York City, Kenneth N. Laptook, Kimmelman, Wolff & Samson, Roseland, N.J., for defendant.

## OPINION

BISSELL, District Judge.

These cross-motions arise out of a Complaint filed on June 7, 1985, by T.B. Harms Company ("Harms") against Jem Records Inc. ("Jem"). This Court has federal question jurisdiction of this action pursuant to 28 U.S.C. § 1338(a). Plaintiff's Complaint alleges that defendant infringed plaintiff's copyright in the musical composition "Ol' Man River" in violation of § 602(a) of the Copyright Act of 1976, 17 U.S.C. § 602(a), arising out of defendant's unauthorized importation, distribution and sale of phonorecords containing this composition. Presently before the Court are cross-motions for partial summary judgment on the issue of liability.

### The Facts

■ In connection with the present cross-motions, the parties have stipulated to an agreed statement of material facts which has been filed with the Court. The stipulated facts are as follows: plaintiff Harms is a California corporation engaged in the business of licensing and marketing copyrighted musical compositions; defendant Jem is a New Jersey corporation engaged in the manufacture, distribution and sale of phonorecords into the United States which embody copyrighted musical compositions. At all times relevant to this case, Harms has been and continues to be the lawful owner of a valid copyright in the musical composition "Ol' Man River," which was written by Jerome Kern and Oscar Hammerstein II.[1] This copyright is

---

1. For purposes of clarity, it is necessary at this juncture to distinguish between a sound recording, a musical composition and a phonorecord. The Copyright Act of 1976 defines the terms "phonorecord" and "sound recording." Phonorecords are "material objects in which sounds ... are fixed by any method ... and from which the sounds can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 101. Included in the term phonorecord is the material object in which the sounds are first fixed. Id. Sound recordings are "works that result from the fixation of a series of musical, spoken or other sounds, ... regardless of the nature of the material objects, such as disks, tapes or other phonorecords, in which they are embodied." Id. A sound recording as copyrightable subject matter must be distinguished from the copyrighted literary, musical or dramatic work embodied in the sound recording and fixed on a phonorecord. When a copyrighted song is recorded on a phonorecord, there are two separate copyrights: one on the musical composition and the other in the sound recording. The sound recording is the aggregation of sounds captured in the recording while the song

registered in the United States Copyright Office and has been duly renewed. A notice of use has also been filed with the Copyright Office.

"Ol' Man River" as performed by Frank Sinatra has been made into a sound recording, which is embodied in a phonorecord entitled "His Greatest Hits, Frank Sinatra—New York, New York." In addition to the musical composition at issue here, this phonorecord also contains fifteen other musical compositions, each owned by a different party, and each performed by Frank Sinatra on sound recordings embodied in the phonorecord. Pursuant to the equivalent of our compulsory licensing provisions in the New Zealand Copyright Act, copies of the Sinatra phonorecord embodying the sound recording "Ol' Man River" were lawfully manufactured and distributed in New Zealand by WEA Records, Ltd., an affiliate of WEA International, Inc. Chappel & Intersong Music Group (Australia) Ltd., which owns the right to authorize the making and distribution in New Zealand of phonorecords embodying performances of plaintiff's musical compositions, received royalties with respect to the making and distribution of phonorecords by WEA Records containing "Ol' Man River."

Copies of this Sinatra phonorecord manufactured by WEA Records were imported into the United States by defendant Jem, who subsequently sold them in this country. Jem's importation of these phonorecords into the United States and its subsequent sale and distribution of them was with the consent of WEA Records, which acted under the authority of the owners of the sound recordings embodied therein. However, this importation and distribution by Jem was without the authority, consent or permission of plaintiff Harms or anyone acting on its behalf. Nor did Jem have the authority of any of the other owners of copyrights in the musical compositions contained in the Sinatra album.

Both compulsory and negotiated licenses have been issued on behalf of plaintiff permitting the manufacture and distribution in the United States of phonorecords embodying the musical composition "Ol' Man River." Moreover, a great number of licenses and other authorizations have been issued to or obtained for the making and distribution of phonorecords embodying performances of "Ol' Man River" outside the United States, many of which were obtained under compulsory licensing provisions of the copyright laws of the respective foreign countries or territories.

On a motion for summary judgment, "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). On the cross-motions presently before the Court, the parties agree and the Court concurs, that there exist no genuine issues of material fact. Therefore, the Court will proceed, upon consideration of the pleadings and affidavits submitted, to determine which party is entitled to judgment as a matter of law.

### The Law

In its Complaint, plaintiff alleges that defendant infringed its exclusive copyright in the musical composition "Ol' Man River" by defendant's unauthorized importation of phonorecords embodying the composition in violation of § 602 of the Copyright Act of 1976 ("the Act"). Section 602 provides that:

(a) Importation into the United States, without the authority of the owner of copyright under this title [17 U.S.C. §§ 101 *et seq.*] of copies or phonorecords of a work that have been acquired outside the United States is an *infringement of the exclusive right to distribute*

---

or tangible medium of expression embodied in the recording is the musical composition. H.R. Rep. No. 94–1476, 94th Cong., 2d Sess. 56, *reprinted in* 1976 U.S.Code Cong. & Ad.News 5659, 5669. Thus, the rights of an owner of a copy-

right in a sound recording do not extend to the song itself. A copyright in the recording and in the song are separate and distinct and by statute are treated differently. N. Boorstyn, *Copyright Law* § 5:11 n. 54 (1981 & Supp.1986).

*copies of phonorecords* under section 106 [17 U.S.C. § 106], actionable under section 501 [17 U.S.C. § 501]. This subsection does not apply to—

(1) importation of copies or phonorecords under the authority or for the use of the Government of the United States or of any State or political subdivision of a State, but not including copies or phonorecords for use in schools, or copies of any audiovisual work imported for purposes other than archival use;

(2) importation, for the private use of the importer and not for distribution, by any person with respect to no more than one copy or phonorecord of any one work at any one time, or by any person arriving from outside the United States with respect to copies or phonorecords forming part of such person's personal baggage; or

(3) importation by or for an organization operated for scholarly, educational, or religious purposes and not for private gain, with respect to no more than one copy of an audiovisual work solely for its archival purposes, and no more than five copies or phonorecords of any other work for its library lending or archival purposes, unless the importation of such copies or phonorecords is part of an activity consisting of systematic reproduction or distribution, engaged in by such organization in violation of the provisions of section 108(g)(2) [17 U.S.C. § 108(g)(2)].

(b) In a case where the making of the copies or phonorecords would have constituted an infringement of copyright if this title [17 U.S.C. §§ 101 *et seq.*] had been applicable, their importation is prohibited. In a case where the copies or phonorecords were lawfully made, the United States Customs Service has no authority to prevent their importation unless the provisions of section 601 [17 U.S.C. § 601] are applicable. In either case, the Secretary of the Treasury is authorized to prescribe, by regulation, a procedure under which any person claiming an interest in the copyright in a particular work may, upon payment of a specified fee, be entitled to notification by the Customs Service of the importation of articles that appear to be copies or phonorecords of the work.

17 U.S.C. § 602 (emphasis added). This provision addresses two separate situations: (1) importation of "piratical" articles, which are copies or phonorecords made without the authorization of the copyright owner, and (2) unauthorized importation of copies or phonorecords which are lawfully made. H.R.Rep. No. 94-1476, 94th Cong., 2d Sess. 169, *reprinted in* 1976 U.S.Code Cong. & Ad.News 5659, 5785 ("House Report"). It is the latter prohibition which is the focus of plaintiff's Complaint.

■ The general approach taken in section 602 is to make unauthorized importation an act of infringement in both situations dealt with in this section, but to permit the U.S. Customs Service to prohibit importation only of "piratical" articles. Unless one of the three enumerated exceptions in § 602(a) applies, any unauthorized importation of copies or phonorecords acquired outside the United States is an act of infringement. Thus, "where the copies or phonorecords were lawfully made but their distribution in the United States would infringe the United States copyright owner's exclusive rights," the mere act of importation constitutes an act of infringement. House Report at 170, U.S.Code Cong. & Admin.News 1976, p. 5786. *See also* 17 U.S.C. § 501(a) ("Anyone ... who imports copies or phonorecords into the United States in violation of § 602, is an infringer of the copyright"); *Columbia Broadcasting System, Inc. v. Scorpio Music Distributors, Inc.*, 569 F.Supp. 47 (E.D. Pa.1983), *aff'd mem.*, 738 F.2d 424 (3d Cir. 1984).

Jem Records has taken the position that § 602(a) does not apply here because it only addresses infringements of the *exclusive* distribution right of the copyright owner. Defendant argues that no such exclusive distribution right exists in phonorecords of compositions, such as "Ol' Man River," available for compulsory licensing under § 115 of the Copyright Act, 17 U.S.C. § 115.

The exclusive rights granted the owner of a copyright pursuant to the Copyright Act includes the exclusive right "to reproduce the copyrighted work in copies or phonorecords" and "to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease or lending." 17 U.S.C. § 106(1), (3). The scope of these exclusive rights is somewhat limited or qualified by the provisions which follow § 106, including § 115 on compulsory licensing of copies or phonorecords. House Report at 61. Thus, the rights in § 106 are made "subject to section 107 through 118," and must be read in conjunction with these provisions. *Id.*

The compulsory licensing provision of the Copyright Act applicable to phonorecords states in relevant part:

> **§ 115. Scope of exclusive rights in nondramatic musical works: Compulsory license for making and distributing phonorecords** In the case of nondramatic musical works, the exclusive rights provided by clauses (1) and (3) of section 106 [17 U.S.C. § 106(1)–(3)], to make and to distribute phonorecords of such works, are subject to compulsory licensing under the conditions specified by this section.
>
> (a) *Availability and Scope of Compulsory License.*
>
> (1) When phonorecords of a nondramatic musical work have been distributed to the public in the United States under the authority of the copyright owner, any other person may, by complying with the provisions of this section, obtain a compulsory license to *make and distribute phonorecords of the work.* A person may obtain a compulsory license only if his or her primary purpose in making phonorecords is to distribute them to the public for private use....
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> (b) *Notice of Intention to Obtain Compulsory License.*
>
> (1) Any person who wishes to obtain a compulsory license under this section shall, before or within thirty days after making, and before distributing any phonorecords of the work, serve notice of intention to do so on the copyright owner. If the registration or other public records of the Copyright Office do not identify the copyright owner and include an address at which notice can be served, it shall be sufficient to file the notice of intention in the Copyright Office. The notice shall comply, in form, content, and manner of service with requirements that the Register of Copyrights shall prescribe by regulation.
>
> (2) Failure to serve or file the notice required by clause (1) forecloses the possibility of a compulsory license and, in the absence of a negotiated license, renders the making and distribution of phonorecords actionable as acts of infringement under section 501 [17 U.S.C. § 501] and fully subject to the remedies provided by sections 502 through 506 and 509 [17 U.S.C. §§ 502–506, 509].
>
> (c) *Royalty Payable Under Compulsory License.*
>
> (1) To be entitled to receive royalties under a compulsory license, the copyright owner must be identified in the registration or other public records of the Copyright Office. The owner is entitled to royalties for phonorecords made and distributed after being so identified, but is not entitled to recover for any phonorecords previously made and distributed.
>
> (2) Except as provided by clause (1), the royalty under a compulsory license shall be payable for every phonorecord made and distributed in accordance with the license. For this purpose, a phonorecord is considered "distributed" if the person exercising the compulsory license has voluntarily and permanently parted with its possession. With respect to each work embodied in the phonorecord, the royalty shall be either two and three-fourths cents, or one-half of one cent per minute of playing time or fraction thereof, whichever amount is larger.
>
> (3) A compulsory license under this section includes the right of the maker of a phonorecord of a nondramatic musical work under subsection (a)(1) to distribute

or authorize distribution of such phonorecord by rental, lease, or lending (or by acts or practices in the nature of rental, lease, or lending). In addition to any royalty payable under clause (2) and chapter 8 of this title [17 U.S.C. §§ 801 *et seq.*], a royalty shall be payable by the compulsory licensee for every act of distribution of a phonorecord by or in the nature of rental, lease, or lending, by or under the authority of the compulsory licensee. With respect to each nondramatic musical work embodied in the phonorecord, the royalty shall be a proportion of the revenue received by the compulsory licensee from every such act of distribution of the phonorecord under this clause equal to the proportion of the revenue received by the compulsory licensee from distribution of the phonorecord under clause (2) that is payable by a compulsory licensee under that clause and under chapter 8 [17 U.S.C. §§ 801 *et seq.*]. The Register of Copyrights shall issue regulations to carry out the purpose of this clause.

17 U.S.C. § 115 (emphasis added). Only in the case of nondramatic musical works, the most common of which is a popular song, are the exclusive rights to reproduce and distribute phonorecords of such works subject to compulsory licensing pursuant to § 115. Boornstyn, *supra,* at § 5:12 n. 62.

In support of its position, defendant first argues that the language of § 602(a) plainly states that that section applies only where the copyright holder has an exclusive distribution right to be infringed. Secondly, defendant relies upon a discussion session of representatives of the music industry, such as the American Society of Composers, Authors and Publishers, with the General Counsel of the U.S. Copyright Office in which comments were made concerning how the compulsory licensing provision of the Act effects a copyright owner's ability to take advantage of the importation prohibition of § 602. Lastly, Jem cites several opinions, decided under the Copyright Act of 1909, which it asserts stand for the proposition that a copyright owner's exclusive reproduction and distribution rights are lost once a musical com-

position becomes available for compulsory licensing. *See, e.g., Jondora Music Publishing Co. v. Melody Recordings, Inc.,* 351 F.Supp. 572 (D.N.J.1972), *vacated,* 506 F.2d 392 (3d Cir.1974), *cert. denied,* 421 U.S. 1012, 95 S.Ct. 2417, 44 L.Ed.2d 680 (1975); *American Metropolitan Enterprises, Inc. v. Warner Brothers Records, Inc.,* 389 F.2d 903 (2d Cir.1968).

The Court does not find defendant's arguments or authorities persuasive. Jem's contention that the language of the Act is clear in that § 602(a) is only enforceable by a copyright owner who has the exclusive right of distribution of the copies or phonorecords is correct. The Court disagrees with defendant, however, on its interpretation of who has this exclusive right. As the Supreme Court has recently stated in interpreting the Copyright Act, "[i]n construing a federal statute it is appropriate to assume that the ordinary meaning of the language that Congress employed 'accurately expresses the legislative purpose.' " *Mills Music, Inc. v. Snyder,* 469 U.S. 153, 105 S.Ct. 638, 645, 83 L.Ed.2d 556 (1985) (quoting *Park 'n Fly v. Dollar Park & Fly, Inc.,* 469 U.S. 189, 105 S.Ct. 658, 662, 83 L.Ed.2d 582 (1985)).

In the case of the Copyright Act, Congress employed the term "exclusive rights" to define the rights of a copyright owner under the Act. *See* 17 U.S.C. § 106. The twelve provisions of the Act following § 106 are captioned "Limitations on Exclusive Rights" and "Scope of Exclusive Rights." *See* 17 U.S.C. §§ 107–118. Specifically, § 115 on compulsory licensing is entitled "Scope of Exclusive Rights in Nondramatic Musical Works." Thus, in no way does the plain language of these provisions seem to imply that a copyright holder's exclusive rights are extinguished once the compulsory licensing or other provisions addressing limitations on these exclusive rights are invoked. This interpretation is further supported by § 501 of the Act which defines what acts constitute copyright infringement. Section 501(a) provides that:

(a) Anyone who violates any of the *exclusive rights of the copyright owner as*

*provided by sections 106 through 118* [17 U.S.C. §§ 106–118], or who imports copies or phonorecords into the United States in violation of section 602 [17 U.S.C. § 602], is an infringer of the copyright.

17 U.S.C. § 501(a) (emphasis added). The plain meaning of this provision supports the view that the existence of the compulsory licensing provision of the Act *does not* automatically extinguish a copyright owner's exclusive rights. This provision is nothing more than a limitation on the owner's rights.

■ The discussion and comments by members of the music industry on the preliminary draft of the Copyright Act, specifically the interplay between §§ 115 and 602 is also not convincing. In the case of the Copyright Act of 1976, Congress initially placed the burden of laying the groundwork for the general revision of the copyright law with the United States Copyright Office. In carrying out this responsibility, the Copyright Office conducted numerous panel discussions in which various interest groups participated by expressing their views and comments on the then existing Act and the Copyright Office's proposed draft. In publishing the statements made by these groups in the House Judiciary Committee's reports on the Act, the Committee expressly disavowed these statements:

> In issuing this material the committee neither approves nor disapproves any of the views expressed therein. The material is issued for the information and convenience of persons interested in U.S. copyright law revision.

Copyright Office, 88th Cong., 2d Sess., Copyright Law Revision, Part 4, Further Discussions and Comments on Preliminary Draft for Revised U.S. Copyright Law III (Forward by Rep. Celler, Chairman, House Common on the Judiciary) (cited in *Harry Fox Agency, Inc. v. Mills Music Inc.*, 543 F.Supp. 844, 864 (S.D.N.Y.1982), *rev'd*, 720 F.2d 733 (2d Cir.1983), *rev'd sub nom. Mills Music Inc. v. Snyder*, 469 U.S. 153, 105 S.Ct. 638, 83 L.Ed.2d 556 (1985)). Judge Weinfeld, in his opinion interpreting

the legislative history of the Copyright Act which was upheld by the Supreme Court, stated that "[u]nless a committee indicates its approval or disapproval, information from an outside source reprinted in a Committee report is ordinarily not helpful legislative history since it is not necessarily either representative or contrary to the Committee's view." *Harry Fox Agency, Inc.*, 543 F.Supp. at 864 (*citing* 2A C. Sands, *Sutherland's Statutory Constructions* § 48.06, at 203 (4th ed. 1973). There, as here, the parties were relying upon statements made at panel discussions used by the Copyright Office to compromise differences among various interest groups and to help it prepare its draft revision bills. The district court in *Mills Music* was unwilling to find statements made at the panel discussions a reliable gauge of legislative intent because the views expressed by these representatives were not necessarily the same as those of the legislators ultimately voting on the bill. *Id.* Accordingly, the statements made by private citizens at a committee hearing who represent private interest groups which have a financial interest in how a statute will be interpreted, is entitled to little, if any, weight in interpreting congressional intent. *Accord Henry Fox Agency*, 543 F.Supp. at 864; *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 204 n. 24, 96 S.Ct. 1375, 1386 n. 24, 47 L.Ed.2d 668 (1976). This leaves the court without affirmative evidence in the legislative history that Congress even intended to cause § 602(a) to be a nullity in the case of phonorecords subject to the compulsory licensing provisions of § 115.

Finally, defendant's assertion that the case law supports its position that a copyright owner's exclusive rights of distribution are lost once a musical composition becomes available for compulsory licensing is misleading. In *Jondora Music Publishing Co. v. Melody Recordings, Inc.*, a case dealing with tape duplication, the Third Circuit, in vacating the District Court of New Jersey's ruling, interpreted the compulsory licensing provision of the Copyright Act. The court concluded that this provision was inserted in the Act not in an effort to penalize composers or owners of copyrights

in musical compositions but to prevent monopolies by manufacturers. 506 F.2d at 395–96. Accordingly, the Court held that the compulsory licensing provision of the statute "should be interpreted in that spirit." *Id.*

Similarly, in *American Metropolitan Enterprises, Inc. v. Warner Brothers Records Inc.*, the Second Circuit found that a copyright holder's right of exclusivity is lost once he has made the work available for compulsory licensing. 389 F.2d at 905. Nevertheless, the court went on to state that any person *who complies with the compulsory licensing provisions* of the Act may manufacture the musical composition in question without becoming liable as an infringer. *Id.* (emphasis added).

These and the other cases cited by the defendant make two points clear. First, the plain language of the compulsory licensing provision of the Copyright Act provides for a compulsory license only of the right to "make and distribute phonorecords of the [copyrighted] work." 17 U.S.C. § 115(a). This point is further supported by recent case law. In *United States v. Gallant*, 570 F.Supp. 303 (S.D.N.Y.1983), the defendant was a middleman distributor and not a manufacturer. Because Gallant did not make the recordings at issue in that case, the compulsory licensing provision of § 115, which refers only to one who seeks to "*make and distribute* phonorecords of the [copyrighted] work," were inapplicable to him. *Id.* at 305 (emphasis added). Therefore, the compulsory license does confer a distribution right but only as to the phonorecords made pursuant thereto. 2 M. Nimmer, *Nimmer on Copyright*, § 8.04[b] (1986). From the facts of the instant case, it is clear that Jem was only a distributor of the Sinatra phonorecord containing the composition "Ol' Man River." Thus, the compulsory licensing provision of the Copyright Act could not be applicable to defendant because, as with the defendant in *Gallant*, Jem was only the middleman distributor of the phonorecord.

Secondly, even if this provision was found to apply to a distributor, as opposed to one who manufactures and distributes,

the defendant in the present case has failed to comply with the provisions of § 115. *See also Lottie Joplin Thomas Trust v. Crown Publishers, Inc.*, 456 F.Supp. 531 (S.D.N.Y.1977), *aff'd*, 592 F.2d 651 (2d Cir. 1978) (defendants may not avail themselves of a defense based on the compulsory licensing provisions of the Copyright Act where they have failed to serve notice of their reliance or to file a copy thereof with the Copyright Office as required by the Act). Accordingly, had the defendant been eligible to invoke the compulsory license provision of the Act, it took no action to properly comply with the requirements of that provision and therefore cannot rely on the provisions of § 115 as a defense to the present action.

■ The present case is clearly analogous to *Columbia Broadcasting System, Inc. v. Scorpio Music Distributors, Inc., supra.* In that case, CBS owned the United States copyrights to six sound recordings, which it authorized a Phillipines corporation to manufacture and sell phonorecords of exclusively in the Phillipines. This Phillipines corporation sold these phonorecords to another Phillipines corporation who in turn sold them to International Traders, Inc., who sold them to Scorpio. Scorpio imported these phonorecords into the United States without the authority of plaintiff copyright holder. CBS filed suit alleging that defendant violated § 602 of the Copyright Act. Defendant Scorpio contended that § 602 is incongruent with the first sale doctrine set forth in § 109(a) of the Act, which is considered a limitation on a copyright owner's exclusive rights under the Act. Under the first sale doctrine, when a copyrighted work is the subject of a valid first sale, the distribution rights of the copyright holder are extinguished and title passes to the buyer. 17 U.S.C. § 109; *Scorpio*, 569 F.Supp. at 48 n. 3. Specifically, Scorpio asserted that because the phonorecords at issue were the subject of a valid first sale, the exclusive rights of the copyright owner, CBS, to distribute these sound recordings had been limited and therefore, § 602 did not apply because CBS no longer had exclusive distribution rights in the recordings at issue.

In *Scorpio,* the district court found that in order for the defendant to take advantage of the first sale protection of § 109(a), the phonorecords in question must have been "lawfully made under this title." 11 U.S.C. § 109(a). Under the language of this provision, the protection it affords is accorded only to third party buyers of copies which have been legally manufactured and sold in the United States and not to purchasers of imports. 564 F.Supp. at 49. The other rationale given by the court for its decision was that to construe § 109(a) as nullifying a copyright owner's ability to invoke the protections against unauthorized importation would render section 602 meaningless. *Id.* As to this latter rationale, the court stated:

> Construing § 109(a) as superseding the prohibition on importation set forth in the more recently enacted § 602 would render § 602 virtually meaningless. Third party purchasers who import phonorecords could thereby circumvent the statute, in every instance, by simply buying the recordings indirectly. Moreover, declaring legal the act of purchasing from a United States importer who does not deal directly with a foreign manufacturer, but who buys recordings which have been liquidated overseas, would undermine the purpose of the statute. The copyright owner would be unable to exercise control over copies of the work which entered the American Market in competition with copies lawfully manufactured and distributed under this title. This court cannot construe the statute so as to alter the intent of Congress, which has set restrictions on the importation of phonorecords in order that rights of United States copyright owners can be preserved.

*Id.* at 49–50. Accordingly, the district court granted plaintiff's motion for summary judgment and held that the undisputed facts demonstrated that Scorpio violated section 602 of the Copyright Act. *Id.*

■ In the present case, defendant similarly tries to persuade this Court to adopt an interpretation of one of the several limitations on a copyright holder's exclusive distribution rights listed in the Act, which would render the prohibitions of section 602 meaningless. The fact that in *Scorpio* the copyrighted work was a sound recording does not distinguish it from the case *sub judice.* The only difference this creates is that the parties relied on different limitations on the owners' exclusive right of distribution. This distinction, however, does not in any way alter the legitimacy and applicability of the reasoning utilized by the *Scorpio* court in reaching its decision. Here, as in that case, to allow the defendant to rely on a limitation of the owner's exclusive rights to circumvent the prohibition on importation would tie the hands of the copyright holder who seeks to exercise his rights to control copies of the work which enter the American market. Thus, in order to construe the Copyright Act so as to fulfill Congress' intent to set restrictions on the importation of phonorecords in order to preserve the rights of these owners, the Court finds that the exclusive rights of a copyright owner to enforce section 602 are not limited by the compulsory licensing provision of the Act.

■ In applying section 602 to the undisputed facts of this case, the Court concludes that as a matter of law, defendant Jem is a copyright infringer under the Copyright Act. *See Selchow & Righter Co. v. Goldex Corp.,* 612 F.Supp. 19 (S.D. Fl.1985); *Nintendo of America, Inc. v. Elcon Industries, Inc.,* 564 F.Supp. 937 (E.D. Mich.1982). Accordingly, the Court grants plaintiff's motion for partial summary judgment on the issue of liability and denies defendant's cross-motion for partial summary judgment.