**BTE, et al.**

v.

**BONNECAZE.**

No. Civ.A. 97–3644.

United States District Court, E.D. Louisiana.

April 7, 1999.

Eric Shuman, Stephen Winthrop Rider, McGlinchey Stafford, PLLC New Orleans, LA, for BTE ET CIE LLC, plaintiffs.

William Alexander Porteous, III, John J. Hainkel, Jr., Porteous, Hainkel, Johnson & Sarpy, New Orleans, LA, John L. Dardenne, Jr., King, LeBlanc, Bland Dardenne, LLP, Baton Rouge, LA, Len R. Brignac, James W. Noe, King, LeBlanc & Bland, LLP, New Orleans, LA, Elizabeth Meek Mayeaux, Frilot, Partridge, Kohnke & Clements, LC, New Orleans, LA, Neville Johnson, Neville Johnson, Attorney at Law, Los Angeles, CA, John Thomas Nesser, III, McDermott International, Inc., New Orleans, LA, for Cary R. Bonnecaze, defendant.

PORTEOUS, District Judge.

This cause came for hearing on March 24, 1999 upon the second motion for partial summary judgment by Kevin Griffin (now reclassified as a defendant) against Cary Bonnecaze (now reclassified as the plaintiff). Oral argument was waived and the matter was taken under submission on the briefs.

The Court, having studied the memoranda submitted by the parties, is fully advised in the premises and ready to rule.

## ORDER AND REASONS

### I. *BACKGROUND*

This litigation arose out of the dissociation of Cary Bonnecaze from the rock band "Better Than Ezra" and his dissociation from the LLC ("BTE, ET, CIE, LLC") formed by its members. Bonnecaze was the former drummer for the rock band. Bonnecaze brought claims, *inter alia*, asserting that as a "joint author" of certain Better Than Ezra songs, he is entitled an to an accounting of his share of copyright royalties, profits and benefits derived from the distribution, sale and reproduction of "Better Than Ezra songs." Kevin Griffin, an individual party to this suit, remains lead vocalist and guitarist in this band. Griffin contends that Bonnecaze did not author these songs at all, but that Griffin himself was the sole author. At the very least, Griffin argues that Bonnecaze never fixed any alleged contributions to the underlying musical compositions at issue in any tangible medium of expression (a necessity for independent copyrightability).

Griffin's central contention is that he would introduce the basic underlying musical composition to the band members, who would then aid in refining this initial material into the product heard on the sound recordings. Griffin maintains that these initial offerings to the band were sufficient to refute any claims that Bonnecaze may have to joint authorship of the underlying songs. However, Bonnecaze claims that he contributed inseparable and interdependent parts of certain songs, including "harmony, lyrics, percussion and song rhythms, melody and song and musical structure." *See* Doc. # 59. Bonnecaze claims that Griffin merely introduced "rough drafts" to the band, who subsequently aided in the creation of the final fixed composition (*i.e.*, the sound recordings).

In a previous "Order and Reasons," this Court set forth the law governing this particular copyright dispute and decided that Griffin had failed to meet his summary judgment burdens at that time. *See* Doc. # 73. Griffin has now brought this second motion for summary judgment, contending that under the applicable law, Bonnecaze has failed to meet an essential element necessary to prove his claim of joint authorship of the underlying songs; namely, that Bonnecaze never fixed any alleged contributions in any tangible medium of expression prior to the sound recordings (a requisite in showing independent copyrightability).

Bonnecaze opposes this motion, claiming that the sound recordings subsequently released as "Better Than Ezra" songs (*e.g.*, the sound recordings embodied on BTE's "Deluxe" alblum) were a sufficient means of fixing his contributions to the underlying songs in a tangible medium of expression.

### II. *LEGAL ANALYSIS*

#### A. *Law on Summary Judgment*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). "The party moving for summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Stults v. Conoco*, 76 F.3d 651 (5th Cir.1996), (citing *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 912–13 (5th Cir.) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).)) When the moving party has carried its burden under Rule 56(c), its opponent

must do more than simply show that there is some metaphysical doubt as to the material facts. The nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis supplied); *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir.1995).

Thus, where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial." *Matsushita Elec. Industrial Co.*, 475 U.S. at 588, 106 S.Ct. 1348. Finally, the court notes that substantive law determines the materiality of facts and only "facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### B. *Joint Work*

 The Court feels that it is necessary to once again set forth the applicable law on this copyright issue. The Copyright Act defines a "joint work" as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole," 17 U.S.C. § 101 (1994). This definition also defines a work of joint authorship. *Childress v. Taylor*, 945 F.2d 500, 505 (2nd Cir.1991). The Second Circuit Court of Appeals has indicated that "[t]he touchtone of the statutory definition [of a joint work] 'is the intention at the time the writing is done that the parts be absorbed or combined into an integrated unit.'" *Thomson v. Larson*, 147 F.3d 195, 199 (2nd Cir.1998) (citing H.R.Rep. No. 1476, 94th Cong. 120, 121 (1976), reprinted in 1976 U.S.Code Cong. & Admin.News 5659, 5735). Furthermore,

although the statute does not define either "inseparable" or "interdependent," the courts have, based in part on the Copyright Act's legislative history, adopted fairly standard definitions. *See Id.; Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1068 (7th Cir.1994). Parts of a unitary whole are considered "inseparable" when they have little or no meaning standing alone. *Childress*, 945 F.2d at 505; *Erickson*, 13 F.3d at 1068. For example, when two authors collaborate to produce one written text, their contributions are inseparable. Parts of a unitary whole are considered "interdependent" when "they have some meaning standing alone but achieve their primary significance because of their combined effect." *Childress*, 945 F.2d at 505; *see also Erickson*, 13 F.3d at 1068. The lyrics and music of a song are often such interdependent parts. The authors of a joint work are co-owners of the copyright in that work. 17 U.S.C. § 201(a); *see also Community for Creative–Non–Violence v. Reid*, 490 U.S. 730, 753, 109 S.Ct. 2166, 2179, 104 L.Ed.2d 811 (1989).

A district court in the Fifth Circuit has recently addressed the issue of joint authorship. *Clogston v. American Academy of Orthopaedic Surgeons*, 930 F.Supp. 1156 (W.D.Texas 1996).[1] The court in *Clogston* stated that "while the terms inseparable, interdependent, and unitary whole have relatively clear meanings, the parties disagree about the nature of the intent necessary to create a joint work. The Fifth Circuit has not addressed this issue." *Id.* at 1158. The court in *Clogston* points to the Second Circuit's *Childress* and its progeny as a useful guideline for this issue. *Id.* at 1158–1159. Since the Fifth Circuit has yet to delineate a stance on the elements for finding joint authorship under § 101, this Court will follow the excellent analysis of the Second Circuit, most recently outlined in *Thomson v. Larson*, 147 F.3d 195.

---

**1.** In *Clogston,* the district court granted summary judgment in favor of the defendant sole-author of a medical textbook and rejected the plaintiff photographer's claim that he was a co-author on the basis of having contributed more than ninety-percent of the photographs. *Id.*

In *Childress*, the Second Circuit construed § 101 of the Copyright Act and set forth "standards for determining when a contributor to a copyrighted work is entitled to be regarded as a joint author" where the parties have failed to sign any written agreement dealing with co-authorship. *Thomson*, 147 F.3d at 200 (quoting *Childress*, 945 F.2d at 501).[2] This Court believes that this directly addresses the matter at issue between Griffin and Bonnecaze. The court in *Childress*, while recognizing that the Copyright Act states only that co-authors must intend that their contributions "be merged into ... a unitary whole," explains further why a more stringent inquiry than the statutory language would seem to suggest is required:

> [A]n inquiry so limited would extend joint author status to many persons who are not likely to have been within the contemplation of Congress. For example, a writer frequently works with an editor who makes numerous useful revisions to the first draft, some of which will consist of additions of copyrightable expression. Both intend their contributions to be merged into inseparable parts of a unitary whole, yet very few editors and even fewer writers would expect the editor to be accorded the status of joint author, enjoying an undivided half interest in the copyright in the published work.

*Id.* at 507. This reasoning evidences a desire to limit the claims of "overreaching" contributors. The court in *Thomson* noted that "[t]he potential danger of allowing anyone who makes even a minimal contribution to the writing of a work to be deemed a statutory co-author—as long as the two parties intended the contributions to merge—motivated the [*Childress* ] court to set forth a two-pronged test." *Thom-*

son, 147 F.3d at 200. Thus, the Second Circuit has held that a "co-authorship claimant bears the burden of establishing that each of the putative co-authors (1) made independently copyrightable contributions to the work; and (2) fully intended to be co-authors." *Id.* (citing *Childress*, 945 F.2d at 507–08). These requirements are an attempt "to strike a balance between 'ensur[ing] that true collaborators in the creative process are accorded the perquisites of co-authorship,' ... while at the same time, 'guard[ing] against the risk that a sole author is denied exclusive authorship status simply because another person render[s] some form of assistance.' " *Thomson*, 147 F.3d at 200 (quoting *Childress*, 945 F.2d at 504).

As to "independently copyrightable contributions," this Court adopts the holding of *Childress*, whereby collaboration alone was found to be insufficient to establish joint authorship. 945 F.2d at 507. What is required, however, is that the contribution of each joint author must be independently copyrightable. *See Id.* The court in *Childress* notes that this is "the position taken by the case law and endorsed by the agency administering the Copyright Act." *Id., see also Thomson*, 147 F.3d at 200; *Seshadri v. Kasraian*, 130 F.3d 798, 803 (7th Cir.1997); *M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d 1486, 1493 (11th Cir.1990).

Secondly, this Court must examine the "intent" of the parties. *Childress*, 945 F.2d at 507–509. The court in *Thomson* indicates, with regard to the mutual intent requirement, as follows:

> *Childress* mandates that the parties "entertain in their minds the concept of joint authorship." 945 F.2d at 508.

**2.** The facts of *Childress* involved the authorship of a play based upon the life of a legendary comedienne. An actress engaged in substantial research on the comedienne's life (including writing a failed script for a play) and eventually enlisted a playwright to write the script. Although the actress provided significant research and helpful advice to the

playwright during the writing process, the court upheld a grant of summary judgment for the playwright because the actress' contributions were not seen to have "ever evolved into more than helpful advice that might come from the cast, the directors, or the producers of any play." *Childress*, 945 F.2d at 509.

This requirement of mutual intent recognizes that, since coauthors are afforded equal rights in the co-authored work, the "equal sharing of rights should be reserved for relationships in which all participants fully intend to be joint authors." *Id.* at 509.

The Second Circuit has not yet explicitly defined the nature of the necessary intent to be co-authors. However, *Childress* and its progeny have provided a good deal of guidance on the issue of intent, which *Thomson* explains in the following passage:

The [*Childress*] court stated that "[i]n many instances, a useful test will be whether, in the absence of contractual arrangements concerning listed authorship, each participant intended that all would be identified as co-authors." *Childress*, 945 F.2d at 508. But it is also clear that the intention standard is not strictly subjective. In other words, co-authorship intent does not turn solely on the parties' own words or professed state of mind. *See Id.* ("[J]oint authorship can exist without any explicit discussion of this topic by the parties."). Rather, the *Childress* court suggested a more nuanced inquiry into factual indicia of ownership and authorship, such as how a collaborator regarded herself in relation to the work in terms of billing and credit, decision making, and the right to enter into contracts. *See Id.* at 508–09. In this regard, the court stated that "[t]hough joint authorship does not require an understanding by the co-authors of the legal consequences of their relationship, obviously some distinguishing characteristic of the relationship must be understood for it to be the subject of their intent." *Id.* at 508.

*Thomson*, 147 F.3d at 201–202 (footnotes omitted).

Moreover, the court in *Childress* emphasized that the requirement of intent must be particularly scrutinized where one person exists clearly as the dominant author of the work, and the only real issue is whether that individual is the sole author or whether the individual and another contributor are joint authors. 945 F.2d at 508. That is precisely the issue we are facing in the "Better Than Ezra" dispute. It is important to realize, as the *Childress* court notes, that "[c]are must be taken ... to guard against the risk that a sole author is denied exclusive authorship status simply because another person render[s] some form of assistance." *Id.* at 504; *see also Erickson*, 13 F.3d at 1069 ("Those seeking copyrights would not seek further refinement that colleagues may offer if they risked losing their sole authorship.").[3]

Under *Childress*, it is clear that a specific finding of mutual intent remains necessary. *Id.* at 508. Even a significant contribution to the work by the alleged co-author "does not automatically suffice to confer co-author status on that contributor." *Thomson*, 147 F.3d at 202 (citing *Childress*, 945 F.2d at 508).[4]

■ As stated above, to proceed with this "intent" inquiry, a court must engage in an examination of the factual indicia of ownership and authorship. Such factors are as follows: (i) the contributor's decision making authority over what changes are made and what is included in a work,

3. In *Erickson* the court enjoined the defendant Trinity Theatre from performing three plays and using two videotapes to which the plaintiff owned the copyrights. The Court held that Trinity was unable to establish joint authorship to the plays at issue, particularly considering the independent copyrightability test.

4. This Court recognizes and concurs with the Second Circuit's stance with regard to *Clogston*, 930 F.Supp. 1156, which is indicated in the following passage from *Thomson*: "[w]e do not go as far as the *Clogston* court, which stated that 'the importance of [a claimant's] contribution' to a work 'is simply not a relevant inquiry' under *Childress*. *Id.* at 1162. And we, therefore, do not embrace Clogston's holding that the 'extent of ... contribution alone is inadequate to create a genuine issue of material fact.' *Id.*" *Thomson*, 147 F.3d at 202, n. 19.

(ii) the way in which the parties bill or credit themselves with regard to the work, (iii) any written agreements with third parties, and (iv) any other additional evidence.

## C. *Independently Copyrightable*

As the Court has indicated above, one of the elements that must be established by a co-authorship claimant is that each of the putative co-authors must have made independently copyrightable contributions to the work in question. *See Childress*, 945 F.2d at 507; *see also Thomson*, 147 F.3d at 200; *Seshadri v. Kasraian*, 130 F.3d 798, 803 (7th Cir.1997); *M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d 1486, 1493 (11th Cir.1990); *Erickson*, 13 F.3d at 1070–1071. In holding that the contribution of each joint author must be copyrightable (as opposed to requiring that only the combined result of their joint efforts must be copyrightable), the Court in *Childress* reasoned as follows:

> [W]e are persuaded to side with the position taken by the case law and endorsed by the agency administering the Copyright Act. The insistence on copyrightable contributions by all putative joint authors might serve to prevent some spurious claims by those who might otherwise try to share the fruits of the efforts of a sole author of a copyrightable work, even though a claim of having contributed copyrightable material could be asserted by those so inclined. More important, the prevailing view strikes an appropriate balance in the domains of both copyright and contract law. In the absence of contract, the copyright remains with the one or more persons who created copyrightable material. Contract law enables a person to hire another to create a copyrightable work, and the copyright law will recog-

nize the employer as "author." 17 U.S.C. § 201(b). Similarly, the person with non-copyrightable material who proposes to join forces with a skilled writer to produce a copyrightable work is free to make a contract to disclose his or her material in return for assignment of part ownership of the resulting copyright. *Id.* § 201(d). And, as with all contract matters, the parties may minimize subsequent disputes by formalizing their agreement in a written contract. *Cf.* 17 U.S.C. § 101.... It seems more consistent with the spirit of copyright law to oblige all joint authors to make copyrightable contributions, leaving those with non-copyrightable contributions to protect their rights through contract.

*Childress*, 945 F.2d at 507.

The actual test utilized for determining copyrightability has been derived by most courts from Professor Paul Goldstein's copyrightability subject matter test (read in conjunction with the Copyright Act itself). *See, e.g. Erickson*, 13 F.3d at 1070–1071 (citing Paul Golstein, *Copyright: Principles, Law, and Practice,* (hereinafter, *Goldstein* ), § 4.2.1.2 (1989)).[5] In part, Professor Goldstein's test provides that "[a] collaborative contribution will not produce a joint work, and a contributor will not obtain a co-ownership interest, unless the contribution represents original expression that could stand on its own as the subject matter of copyright." *Erickson*, 13 F.3d at 1070 (citing *Goldstein*, at § 4.2.1.2, p. 379).[6] The court in *Erickson* agreed that the language of the Copyright Act supports the adoption of the copyrightability requirement. *Id.* at 1071. The court concluded as follows:

> Section 101 of the Act defines a "joint work" as a "work prepared by two or

---

5. Many courts have noted that Goldstein's test is superior to the "de minimis" test for copyrightability propounded by Professor Nimmer. *See, e.g., Erickson,* 13 F.3d at 1069–1070.

6. Professor Goldstein and the courts adopting his test justify this position by noting that § 101's and § 302(b)'s use of the word "authors" suggests that each collaborator's contribution must be a copyrightable "work of authorship" within the meaning of § 102(a). *See Erickson,* 13 F.3d at 1070–1071.

more authors." ... To qualify as an author, one must supply more than mere direction or ideas. An author is "the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 737, 109 S.Ct. 2166, 2171, 104 L.Ed.2d 811 (1989). As to the requirement of fixation, § 101 states:

> A work is "fixed" in a tangible medium of expression when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration.

17 U.S.C. § 101.

*Id.; see also, Ahn v. Midway Manufacturing Company,* 965 F.Supp. 1134, 1139 (N.D.Ill.1997); *Cabrera v. Teatro Del Sesenta, Inc.,* 914 F.Supp. 743, 764–765 (D.Puerto Rico 1995). The court further explains that the copyrightability subject matter test, in furthering the principles behind the Copyright Act such as creativity, the unhindered exchange of ideas, and predictability, "excludes contributions such as ideas which are not protected under the Copyright Act. 17 U.S.C. § 102(b) ('In no case does copyright protection for an original work of authorship extend to any idea ... embodied in such work.')." *Id.* (other citations omitted). In other words, helpful guidance, ideas, and contributions to a work are insufficient under this test, unless, among other requirements, those things have been fixed in a tangible form of expression.[7]

In *Erickson* itself, the court found no joint authorship with regards to certain plays because the Trinity Theatre could not show that its actors' contributions were independently copyrightable. *Id.* at

1072. The court stated that the actors, on the whole, could not identify specific contributions to plaintiff's works. Even when someone was able to do so, the contributions identified were not independently copyrightable. As this Court has attempted to make clear, "[i]deas, refinements, and suggestions, standing alone, are not subjects of copyright." *Id.*

In another supportive case, *Cabrera,* 914 F.Supp. at 766, the court held that ideas or non-tangible contributions are not copyrightable. Here, a purported author of a play brought a copyright infringement action against members of a theatre company, alleging that the company was performing the play in violation of his authorship rights. *Id.* at 745–746. The court noted that the only evidence presented tended to indicate that some of the members of the company provided phrases, lines for the dialogue of the characters and perhaps the lyrics. *Id.* at 759–760. However, none of the members, except for one, was capable of identifying specific portions of the script that could have been written by them. *Id.* at 760. The court, in adopting the copyrightability test endorsed above, held that the members who could not specifically identify their contributions had failed the copyrightability test. *Id.* at 766. The court stated as follows:

> Whether or not these defendants actually contributed concrete ideas (which are not copyrightable) that were included in the final product or served merely as "sounding boards" is in fact irrelevant in view of the applicability the "copyrightability test." These defendants have not introduced evidence which indicates to the court that they contributed something copyrightable as the "tangible expression of an idea," in accordance with the purpose of the Act and the Supreme Court. Absent this showing, these de-

7. The Court points out once again that it is not the *combined* product of joint efforts that must be copyrightable, but *each* author's contribution must be separately copyrightable.

An essential element of copyrightability is that the work (contribution) be fixed in a tangible form of expression.

fendants cannot be held to be co-authors of the [play]. Having determined the lack of copyrightable contributions of these defendants, the Court need not address the element of intent.... Even though these defendants had no copyrightable contribution, there is no doubt however, that they did work and assisted "by giving the best of [them]" in enhancing the contents and quality of the final work.

*Id.*

Regarding the one member of the company ("Molina") whom the court found did not fail the copyrightability test (although the court eventually found that this individual failed the "intent" requirement for joint authorship), the court held that she had clearly contributed something that had been fixed in a tangible form of expression. *Id.* at 767. Molina had written the initial script for the first act of the play and that script had been "substantially utilized and incorporated in the final version of the play." *Id.* at 753. Moreover, Molina was able to clearly identify her initial manuscript and a revised copy of the first act, contributions fixed in a tangible medium that had obviously found their way into the final version of the play. *Id.* at 757–758. Molina was distinguished from the other members, in that, although they all claimed contributions of ideas, etc., she was the only one who created some tangible work to point to that eventually ended up in the final version of the play. *Id.* at 760.

In the suit at issue, Bonnecaze claims that he presented valuable contributions to Griffin and the rest of the BTE band in "working up" the songs. Moreover, Bonnecaze claims that these contributions were eventually fixed in a tangible form of expression when the band (including Bonnecaze) created the sound recordings of the underlying songs. However, Bonnecaze confuses the applicable copyright rules here. Bonnecaze has yet to produce any evidence that any alleged contributions that he made to the underlying songs were ever fixed in a tangible form of expression. Bonnecaze's contributions to the sound recordings are not in dispute. He clearly has a copyright to his contributions that were fixed in the sound recordings. The problem lies in the distinction between the underlying songs and the sound recordings.

### D. *Sound Recordings and Musical Compositions*

Sound recordings and the underlying musical compositions are separate works with their own copyrights. In one case distinguishing the copyrighted musical compositions of "Ol' Man River," written by Jerome Kern and Oscar Hammerstein II, from the sound recording of that composition performed by Frank Sinatra, the court delineated the differences between an underlying musical composition, a sound recording and a phonorecord.[8] *T.B. Harms Company v. Jem Records*, 655 F.Supp. 1575 (D.N.J.1987). There the court stated as follows:

A sound recording as copyrightable subject matter must be distinguished from the copyrighted literary, musical or dramatic work embodied in the sound recording and fixed on a phonorecord. When a copyrighted song is recorded on a phonorecord, there are two separate copyrights: one on the musical composition and the other in the sound recording. The sound recording is the aggregation of sounds captured in the recording while the song or tangible medium of expression embodied in the recording is the musical composition. H.R.Rep. No. 94–1476, 94th Cong., 2d Sess. 56, reprinted in

---

**8.** Phonorecords are "material objects in which sounds ... are fixed by any method ... and from which the sounds can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or a device." 17 U.S.C. § 101. An example of a phonorecord in our case would be the "Deluxe" CD of "Better Than Ezra" that one could purchase at a music store. There is no dispute over phonorecords in the case at issue.

1976 U.S.Code Cong. & Ad.News 5659, 5669. Thus, the rights of an owner of a copyright in a sound recording do not extend to the song itself. A copyright in the recording and in the song are separate and distinct and by statute are treated differently. N. Boorstyn, *Copyright Law* § 5:11 n. 54 (1981 & Supp. 1986).

*Id.* at 1577, n. 1; *see also Jarvis v. A & M Records*, 827 F.Supp. 282, 292 (D.N.J.1993) ("Under the Copyright Act, there is a well-established distinction between sound recordings and musical compositions.... The Copyright Act defines sound recordings as: 'works that result from the fixation of a series of musical, spoken, or other sounds, but not including the sounds accompanying a motion picture or other audiovisual work, regardless of the nature of the material objects, such as disks, tapes, or other phonorecords in which they are embodied.' 17 U.S.C. § 101. Pursuant to this distinction, 'the rights of a copyright in a sound recording do not extend to the song itself,' *see T.B. Harms Co. v. Jem Records, Inc.*, 655 F.Supp. 1575, 1577 n. 1 (D.N.J.1987) (Bissell, D.J.), and vice versa.").[9]

■ In the case at issue, BTE and its individual members (the defendants) concede that Bonnecaze has copyright interests in the sound recordings of the songs that he played with the band. However, the defendants correctly contend that a copyright of the sound recordings is separate and distinct from the copyright of the underlying musical composition. While Bonnecaze claims that he contributed ideas and helpful insights in "working up" the songs introduced to the band by Kevin Griffin, Bonnecaze has failed to supply the court with any evidence (after ample time for discovery) which could lead a rational trier of fact to find that Bonnecaze had ever fixed those contributions into a tangible form of expression. The sound recordings of the songs cannot serve as the tangible form required for Bonnecaze to meet the independently copyrightable test required for proving joint authorship. Bonnecaze has not indicated to the Court why he should be included as a joint author of these underlying songs. If Bonnecaze had wished to share in the fruits of Griffin's "rough drafts," then Bonnecaze had either to satisfy the requirements of joint authorship (which he has failed to do) or to contract with Griffin for a portion of the royalties. This Court cannot come in now and bestow those rights upon Bonnecaze. Such a ruling would be in contravention of the purposes of the Copyright Act and the well-reasoned requirements for joint authorship.

Accordingly,

**IT IS ORDERED** that Kevin Griffin's motion for partial summary judgment is **GRANTED, DISMISSING** Bonnecaze's claims for joint authorship under the Copyright Act as to the underlying musical compositions of the songs at issue.

---

9. This rule is further exhibited in the following passages:

> A sound recording must be distinguished from, on the one hand, the material object on which the sound is recorded, and, on the other, the underlying musical composition ... that is recorded and transposed into aural form by the sound recording.... [T]he sound recording copyright does not attach to the underlying work *per se*, but only to the aural version of such work as fixed on the material object. A sound recording is, in this sense, a derivative work. Thus, the originality that may be claimed in a given musical work will not in itself constitute the originality necessary to support a copyright in a sound recording of such musical work.

Melville Nimmer & David Nimmer, *Nimmer on Copyright*, Volume 2–172.3, § 2.10[A][2] (footnotes omitted); and:

> [W]hen an original song is recorded by any means in any form ..., there are two separate copyrighted works: a musical composition and a sound recording. Ordinarily, the copyright owner of the musical composition has no rights in the sound recording copyright and vice versa.

Neil Boorstyn, *Boorstyn on Copyright*, Volume 2–52, § 2.12 (footnotes omitted).